**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Charles BECKHAM, et al., Defendants-Appellees,**

v.

**POST–NEWSWEEK STATIONS, MICHIGAN, INC., et al., Non-Party Appellants.**

**Nos. 83–1811, 83–1812 and 84–1389.**

United States Court of Appeals, Sixth Circuit.

Argued July 16, 1985.

Decided April 29, 1986.

Rehearing and Rehearing En Banc Denied June 13, 1986.

Maura D. Corrigan, U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Deborah J. Gaskin, Detroit, Mich., Thomas O'Brien, Ann Arbor, Mich., Richard E. Zuckerman, Troy, Mich., Neil H. Fink, Fink & Larene, David F. Dumouchel, David Griem, N.C. Deday LaRene, Detroit, Mich., for defendants-appellees.

John J. Ronayne, III (argued) Chester E. Kasiborski, Jr., Van Til, Kasiborski & Ronayne, Richard E. Rassel, Raymond J. Carey (argued), James E. Stewart, Butzel, Long, Gust, Klein, Van Zile, Bronson Murray, Detroit, Mich., for non-party appellants.

Before JONES, CONTIE and MILBURN, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Members of the news media appeal the district court's denials of permission to copy tape-recordings that were admitted as evidence in a criminal trial, transcripts of these tape-recordings that were used by the jury, and documentary exhibits. They argue that both the Constitution and the common law provide a right to contemporaneous access to copy these materials. On review, we find that the district court's orders did not violate the constitutional rights of the appellants and that, under the common law, the district court did not abuse its discretion in denying permission to copy the tape-recordings and transcripts. We find, however, that the district court did abuse its discretion under the common law in declining to rule on the application to copy the documentary exhibits and in refusing to grant permission to copy the documentary exhibits. Accordingly, we affirm the district court's orders in part and reverse in part.

## I.

The criminal prosecution involved in this appeal began in Detroit in the summer of 1983. The defendants, including a city official, were accused of defrauding the City of Detroit. It was public knowledge that the government had audiotapes and videotapes (hereinafter "the tapes") to present at trial. *See In re Post-Newsweek Stations, Michigan, Inc.,* 722 F.2d 325, 327 (6th Cir.1983) (denying petition for writ of mandamus to compel court to release these tapes). In August 1983 the district court held a suppression hearing, but members of the media made no application to inspect or copy the tapes. As described by this Court in *Post-Newsweek Stations:*

> The trial began on September 26, 1983. Arrangements were made to guarantee the press unfettered access to the trial. Front-row seats were reserved for the press; the tapes were played in a manner which permitted public viewing; and all evidentiary rulings were made in open court. The media petitioners first intervened to challenge the closure of jury voir dire. Initially, the voir dire had been conducted in chambers because of excessive pretrial publicity. The defendants, however, withdrew their request to close the voir dire, and the process was moved to the jury room which permitted public viewing. Inexplicably, questions during voir dire did not address the possibility of jury sequestration, despite the extensive pretrial media attention surrounding the case. On September 29, a jury was impaneled.

> Testimony in the case began on October 3. On October 5, the district court adjourned the proceedings until October 11 to consider several evidentiary issues. Throughout this time the district court received no formal application from the media for access to the tapes, even though on October 3 it had decided that certain portions of the tapes would be admitted into evidence.

*Id.* The tapes were broadcast in open court over a loudspeaker. The jurors were given earphones with volume controls. The jurors were also given transcripts of the tapes, which they followed while listening to the tapes. The district court instructed the jurors that only the tapes were evidence. The court explained that the transcripts were a mere visual aid, and it repeated several times that the jurors were

not to rely on the transcripts when the tapes were unclear or the transcripts were at variance with the tapes.

Appellants (hereinafter the Media) first attempted to obtain copies of the tapes, transcripts and exhibits by making a request to government counsel. This request was formalized on October 7, 1983, when the Media filed an application to the court for contemporaneous access to all tapes, transcripts and documentary exhibits admitted into evidence or used at trial. The court heard argument on the Media application that same day, but because of the importance of the issues raised, it withheld ruling on the merits for ten days to allow the criminal defendants time to respond. The court refused, however, to stay the criminal proceedings during that ten-day period.

On October 10, 1983, the Media petitioned this Court for a writ of mandamus. In that petition, the Media requested that the district court be compelled either to render a decision on their application or to grant a stay of the criminal proceedings until such decision was rendered. In the alternative, the Media requested an order granting them contemporaneous access to inspect and copy the tapes, transcripts and documentary exhibits. Contemporaneous access is access at the time the evidence is presented in court or at the end of the day in which the evidence is introduced. *See* app. at 235, 251.

On October 13, the Court denied the Media's petition. On October 17, 1983, the district court issued an order denying the Media's application for contemporaneous access to the tapes. The Media then moved for a clarification of the order, seeking to determine whether the order also denied access to the transcripts and other documentary exhibits. In response to this motion for clarification, the district court on October 21 issued a second order that denied contemporaneous access for the purpose of copying the transcripts, but granted the right to inspect all documentary trial exhibits. The order stated, however, that the court was "not ruling on petitioners'

application to copy these trial exhibits." App. at 170, 185.

The Media made another attempt to gain access to the tapes and transcripts, and the right to copy the documentary trial exhibits, by making a request at the conclusion of proofs in the criminal trial. The district court denied this request on the ground that the jury was not yet discharged, and that after the jury deliberation the court would no longer have possession nor supervisory control over the evidence. App. at 176.

Shortly thereafter, this court issued its opinion regarding the denial of the Media's mandamus petition. We found that the district court had not rendered a final appealable order and that mandamus was not appropriate when the only conduct at issue was the discretionary granting of a ten-day delay for additional study and briefing. *In Re Post-Newsweek Stations, Michigan, Inc.,* 722 F.2d 325 (6th Cir.1983).

The jury was dismissed on December 13, 1983, having reached guilty verdicts against three defendants on some counts, but having been unable to render a verdict on the remaining defendants and counts. Retrial was scheduled to begin in February 1984, but was later adjourned.

In January 1984, the Media filed applications for contemporaneous access to the tapes, transcripts and documentary trial exhibits, in anticipation of the second trial. Argument was heard on these applications on February 10 and June 7. On June 7, 1984, the district court stated that

With respect to the media's renewed request for contemporaneous access to the documentary exhibits, we have again determined that contemporaneous access to the documentary exhibits does not threaten defendants' due process right to a fair trial. Accordingly, we direct the Assistant United States Attorney in charge of this case to submit to the United States Marshal, at the close of each day, all of the documents that are put into evidence on that day. The Marshal will then make these exhibits available to the media.

App. at 282. Apparently under the local rules of court, the district court does not take custody of trial exhibits, and the parties are responsible for their own exhibits. *See* app. at 166. The district court denied the Media's request for contemporaneous access to the tapes and transcripts:

> We, therefore, conclude that on balance the media's common law right of access does not entitle it to contemporaneous access to the audio and visual tapes introduced into evidence. We do not find it an undue burden on this common law right, in light of the important constitutional fair trial rights of the defendants to delay access until the conclusion of all the evidence.

App. at 285. The Media filed appeals from the district court's final orders of October 17 and 21, 1983, and June 7, 1984.

On June 14, 1984, this Court denied the Media's requests to (1) stay the retrial, (2) advance consideration of the appeal, and (3) reverse the district court's order and remand with directions to enter orders permitting appellants to inspect and copy all audio and video tapes, transcripts of tapes or exhibits contemporaneously with their introduction or use at trial.

The retrial of the criminal case, which commenced on June 18, 1984, ended with guilty verdicts on August 14, 1984. The Media then sought copies of the tapes from the United States Attorney's office, which responded that it required guidance from the district court. On August 23, 1984, the Media filed a request for post-trial access to copy the audio and video tapes that had been introduced into evidence. There was no request for copies of the transcripts or documentary exhibits.

In a post-trial hearing, the government agreed to provide copies of the tapes to the Media, and the district court essentially concluded that its role had ended. On September 2, 1984, the district court dismissed the application for post-trial access to the tapes, explaining that it no longer had possession of the tapes and that the request for access from the court was therefore moot. App. at 311. The U.S. Attorney then provided full access to the tapes and documentary exhibits. The Media did not file a notice of appeal of the September 2 order.

Thus the Media here appeals only the district court's denials of contemporaneous access to copy the tapes, transcripts and documentary exhibits. The defendants filed no briefs in response and did not participate in the appeal. The government's brief was confined to the issue of whether the questions on appeal are now moot.

## II. Mootness

█ The government argues that the issues on appeal are moot. The power of a federal court to review pre-trial and mid-trial orders that become moot after trial rests on the exception to the mootness doctrine for orders "capable of repetition, yet evading review." *See, e.g., Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). Criminal trials are usually concluded before an appellate court can take jurisdiction and decide the merits of the appeal, which means that questions regarding public access to the trial are rendered moot when the trial ends.

█ We find the issues in this case reviewable because they are capable of repetition, but, due to their nature, easily become moot and thus evade review. Assuming there is a right to contemporaneous access for copying such tapes during trial, that right could never be vindicated in a federal court if post-trial access or the conclusion of the trial could destroy the controversy.

The Sixth Circuit case cited by the government, *In re Knoxville News-Sentinel Co.,* 723 F.2d 470 (6th Cir.1983), is distinguishable on both its facts and procedural posture. There the district court ordered a record to be sealed because it contained bank documents, including personal

information about borrowers. *Id.* at 472. Seven days later the court dismissed the action and lifted its protective order. *Id.* Within that one-week period, two petitions for mandamus were filed. *Id.* This Court held that the petitioners' request for access to the files via mandamus was moot because access had been granted. *Id.* at 473. We explained that the requested instruction to the district court, to refrain from issuing similar orders in the future, was unnecessary in the absence of an immediate, real need for such relief. *Id.* The present appeal, however, is not before us on a mandamus petition seeking extraordinary relief. Therefore the *Knoxville News* requirement, that there be an immediate danger of repetition of the same order in the same matter, is inapplicable.

### III. Constitutional Grounds

The Supreme Court has not addressed the precise issues before us. The Court has discussed, however, the media's and public's constitutional right to attend criminal trials, *see, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and has also discussed the common-law basis for the right of access to tape-recordings admitted into evidence. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).

In *Richmond Newspapers*, the Court concluded that the right of the public and press to attend criminal trials is constitutionally guaranteed under the First and Fourteenth Amendments. The trial court there had completely excluded the press and the public, articulating no justifications. The Court held, in the plurality opinion, that "[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." 448 U.S. at 581, 100 S.Ct. at 2829. The Court cautioned that this right is not absolute. *Id.* at 581 n. 18, 100 S.Ct. at 2830 n. 18. It declined, however, to list circumstances in which all or part of a criminal trial could be closed. *Id.* Chief Justice Burger, writing

for the plurality, explained generally that "in the interest of the fair administration of justice," a trial court may impose "reasonable limitations on access to a trial." *Id.*

Overall, the plurality was concerned with protecting "the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Id.* (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941)). On the other hand, the plurality was also concerned with the atmosphere and orderliness of the trial:

> It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets. (citations omitted) Moreover, since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated.

448 U.S. at 581–82 n. 18, 100 S.Ct. at 2829–30 n. 18. The plurality explained that criminal trials were traditionally open to as many people as wanted or were able to come near enough to hear. *Id.* at 566, 100 S.Ct. at 2821. Because not all members of the public will fit into a courtroom, the media play an important role as representatives and may be allowed preferential positions in the courtroom. *Id.* 573, 581–82 n. 18, 100 S.Ct. at 2825, 2829–30 n. 18. It is fundamental that the public and the press have "a right to be present" and the "rights to speak and to publish concerning what takes place at a trial." *Id.* at 576–78, 100 S.Ct. at 2821.

In *Richmond Newspapers*, the policy reasons for the decision were set forth in detail. Openness of trial proceedings, said the Court, promotes many valuable goals: the appearance of fairness; public confidence in the judicial system; the discouragement of misconduct, perjury or secret bias; the enhancement of the performance of all parties; the protection of the judge from imputations of dishonesty; the education of the public; the provision of a safe outlet for public hostility and concern; the

avoidance of covert actions and secret proceedings; and equal treatment of rich and poor. The Court said, as it has said before, that "What transpires in the court room is public property." 448 U.S. at 573 n. 9, 100 S.Ct. at 2825 n. 9. (quoting *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947)). The Media suggests that this statement implies some sort of ownership interest in the tangible records and documents at trial. While the public probably does have some indirect ownership interest in all government property, the statement is merely a dramatic way of stating that the public has a right to *know* what transpires.

In *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the facts again involved complete exclusion of the public and the press from the entire trial, a rape prosecution. In that case, a state statute required clearing the courtroom when young victims of alleged rapes were examined, and the trial court, in its discretion, had ordered the closure of all the trial proceedings. The majority of the Court stated that nondisclosure of sensitive information is only justified where a compelling interest is shown and the denial of access is narrowly tailored to serve that interest. *Id.* at 606–07, 102 S.Ct. at 2619–20. The majority concluded that the state's interests were compelling enough to justify restriction of public attendance at a criminal trial, but that

the statute was not narrowly tailored to serve that interest because it imposed an absolute requirement that certain portions of rape prosecutions be closed to the public in all cases. *Id.* at 607–08, 102 S.Ct. at 2620. The Court reaffirmed that public access to criminal trials is a fundamental right under the First Amendment and echoed the rationale of *Richmond Newspapers*. *Id.* at 604–05, 102 S.Ct. at 2618–19.[1]

In sum, the Supreme Court in *Richmond Newspapers* and *Globe Newspaper* focused on the right to open attendance at criminal trials, and it declared a non-absolute right to such attendance. Both cases involved complete exclusion of the media from the trial proceedings. Applying the holdings of these cases to the appeal before us, it is indisputable that the Media was never denied its constitutionally guaranteed right to be present at the trial. It was given preferential seating. Tapes that the jury heard through earphones were broadcast in open court over loudspeakers. No restrictions on attendance, note-taking or publication were imposed. The Media had an unfettered "opportunit[y] for the communication of thought and the discussion of public questions" as required by the Constitution. *See Richmond Newspapers*, 448 U.S. at 581–82 n. 18, 100 S.Ct. at 2829–30 n. 18. The Media in this case was not excluded from the courtroom.

The facts and issues in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98

1. The dissent argues that in *Globe Newspaper* the public could have obtained the same information from a transcript of the testimony, but the Court still found the First Amendment applicable. This demonstrates, according to the dissent, that an alternative source of information is not an automatic justification for a denial of permission to copy public records.

Preliminarily we note that none of the factors should be considered conclusive or automatic justifications. Second, although the free availability of all information via the completely open proceedings is not a conclusive factor in the balancing under the common-law right to inspect and copy, it is the key factor in determining whether constitutional rights have been infringed. The Supreme Court in *Warner Communications* stated that as long as the public and media have full access to the trial proceedings and full freedom to publish, the First and

Sixth Amendments have not been violated, as discussed at pages 407–09.

We believe that under the circumstances in *Globe Newspapers*, in which the public was excluded from the courtroom, a copy of the trial transcript would not have satisfied the constitutional requirement of an open public trial. When the public and the media are barred from the courtroom, the public has no way of knowing what actually transpired within, and the trial transcript would be subject to serious question and doubt. In such circumstances, one might legitimately complain of justice done in a corner or in a covert manner.

The trial judge in this case did not deprive the public of the opportunity to see and hear the evidence as it was presented to the jury. This is not a case where the court offered a substitute that was less than the original, first-hand, genuine article.

S.Ct. 1306, 55 L.Ed.2d 570 (1978), were similar to those in the present appeal. *Warner Communications* involved the criminal trial of several of President Nixon's former advisers in connection with the Watergate investigation. Portions of tape-recordings were played for the jury and the public in the courtroom, and the reels of tape were admitted into evidence. The district court furnished the jurors, reporters, and members of the public in attendance with transcripts, which were not admitted as evidence. Members of the media attempted to obtain immediate access to the tapes as well, which the district court denied. The Supreme Court addressed both constitutional and common law arguments for the media's right to copy the tapes.

The media argued in *Warner Communications* that it had a right to copy the tapes under both the First Amendment guarantee of freedom of the press and the Sixth Amendment guarantee of a public trial. The Court rejected these arguments, finding no constitutional basis for the asserted right to copy the tapes. 435 U.S. at 608, 98 S.Ct. at 1317. One of the arguments made by the media was that the public's understanding of the highly publicized trial remained incomplete without the opportunity to listen to the tapes and form their own judgments as to their meaning. The Court rejected this argument:

> In the first place, this argument proves too much. The same could be said of a live witness, yet there is no constitutional right to have such testimony recorded and broadcast. Second, while the guarantee of a public trial, in the words of Mr. Justice Black, is "a safeguard against any attempt to employ our courts as instruments of persecution," it confers no special benefit on the press. Nor does the Sixth Amendment require that the trial—or any part of it—be broadcast live or on tape to the public. The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed. That opportunity abundantly existed here.

435 U.S. at 610, 98 S.Ct. at 1318 (citations omitted).

In *Warner Communications*, the media had relied on the Supreme Court's opinion in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), to support its assertion of a First Amendment right to copy and publish exhibits and materials displayed in open court. *See* 435 U.S. at 608–09, 98 S.Ct. at 1317.

> Respondents [broadcasters] argue that release of the tapes is required by both the First Amendment guarantee of freedom of the press and the Sixth Amendment guarantee of a public trial. Neither supports respondents' conclusion.... Respondents claim that *Cox Broadcasting* guarantees the press "access" to—meaning the right to copy and publish—exhibits and materials displayed in open court.
>
> This argument misconceives the holding in *Cox Broadcasting*.

*Warner Communications*, 435 U.S. at 608–09, 98 S.Ct. at 1317. In *Cox*, the Court had held that, under the First Amendment, a state could not prohibit the press from publishing a rape victim's name, where the name was given on court records. The majority opinion in *Warner Communications* explained that *Cox* merely affirmed the media's right to publish facts that were in court records open to the public. 435 U.S. at 609, 98 S.Ct. at 1317. It said *Cox* stood for the proposition that the press cannot be "prevented from reporting what it had learned and what the public was entitled to know." *Id.* at 609, 98 S.Ct. at 1317. The Court in *Warner Communications* stated that *Cox* simply did not apply:

> There simply were no restrictions upon press access to, or publication of, any information in the public domain. Indeed the press—including reporters of the electronic media—was permitted to listen to the tapes and report on what was heard.

435 U.S. at 609, 98 S.Ct. at 1317. On these grounds, the Court in *Warner Communications* found that there was no constitu-

tional right to access to the tapes. The Court noted that the public never had access to the Watergate tapes as physical objects and that the press had only the same rights as the general public. *Id.* at 609, 98 S.Ct. at 1317. In describing the issue before it, the Court stated that the issue

is not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes—to which the public has never had *physical* access—must be made available for copying.

*Id.* (emphasis in original). This passage indicates clearly that there is a difference between an opportunity to hear the tapes and access to the tapes themselves.

■ Applying the Court's reasoning in *Warner Communications* to the present appeal, we find that there was no obstruction of the free flow of information. There were no restrictions on media access to the trial or on the publication of information in the public domain. The Constitution requires that members of the public and the media have the opportunity to attend criminal trials and to report what they have observed. *Warner Communications,* 435 U.S. at 610, 98 S.Ct. at 1318. As in *Warner Communications,* "[t]hat opportunity abundantly existed here." *See id.* If a right to copy the tapes and transcripts in this case exists, it must come from a source other than the Constitution.

### IV. Common Law

The Supreme Court has recognized the general, common-law right to inspect and copy public records and documents, including judicial records and documents. *See Warner Communications,* 435 U.S. at 597, 98 S.Ct. at 1311. The Court has stated clearly, however, that this right is not absolute and that a court may exercise supervisory powers over the materials in its custody. *Id.* at 598, 98 S.Ct. at 1312. Although the Court noted the scarcity of authority on the subject, it set forth the accepted stan-

dard for reviewing such requests for access:

The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.

*Id.* at 599, 98 S.Ct. at 1312. Justice Stevens in his dissent emphasized this point, referring to the trial court's discretion over "its own housekeeping duties," and stating that "[o]nly an egregious abuse of discretion should merit reversal." *Id.* at 614–15, 98 S.Ct. at 1320–21.

The Court did "not undertake to delineate precisely the contours of the common law right." *Id.* at 599, 98 S.Ct. at 1312. It described the task of a court as one "of weighing the interests advanced by the parties in light of the public interest and the duty of the court." *Id.* at 602, 98 S.Ct. at 1314. The duty of the trial court is "to exercise an informed discretion as to release of the tapes, with a sensitive appreciation of the circumstances that led to their production." *Id.* at 603, 98 S.Ct. at 1314. Other factors to be weighed include the court's supervisory powers, the amount of benefit to the public from the incremental gain in knowledge that would result from hearing the tapes themselves, the degree of danger to the defendants or persons speaking on the tapes, the possibility of improper motives on the part of the media such as promoting public scandal or gratifying private spite, and any special circumstances in the particular case. *Id.* at 599–603, 98 S.Ct. at 1312–14. When weighing the factors, courts are to apply a presumption in favor of access, but the Court declined to state whether the presumption should be a slight or strong one. *Id.* at 602, 98 S.Ct. at 1314. None of these factors is conclusive; all the relevant facts and circumstances must be weighed together. *See id.* at 599, 98 S.Ct. at 1312.

In essence, the majority generally recognized the presumptive common-law right of access to judicial records and assumed *arguendo* its applicability to a request for

copies of tapes, but stated that it was not a constitutional right nor an absolute right, and that courts in politically sensitive cases have a responsibility to consider both the public's interests and the court's duty of fairness in the administration of justice. *See id.* at 597–602, 98 S.Ct. at 1311–16. Finally, although the Court discussed the common-law right of access, it did not apply it. The Presidential Recordings Act governed access to the tapes and obviated the need to exercise the common-law right. *Id.* at 606–07 & n. 18, 98 S.Ct. at 1316–17 & n. 18.

In the appeal before us, the district court articulated and weighed the following factors before denying the motion made during the first trial: the difficulty, expense and unfairness of unexpected sequestration of the jury; the court's provisions for complete access of the Media to all proceedings; the community turmoil and tense atmosphere, which could permeate the courtroom and impart a carnival feeling that would render cautionary instructions ineffective;[2] the alleged running battle between the Mayor and the Media involving excessive coverage of accusations against political leaders when they are members of a minority group; the detrimental effect of the tapes on a "fragile community climate"; the "misleading aura of accuracy to a tape recording"; the court's belief in the absence of improper motives on the part of the Media; the full

reporting made possible by the court's unrestricted attendance policies, preferential seating and lack of restrictions on note-taking; and the defendants' right to a fair trial, which could be seriously jeopardized.[3]

The Media's motion for copying privileges before the second trial was made well before trial, so that some of the factors favoring denial were not as strong. For example, there was no problem with tardy assertions of rights and no problem with mid-trial sequestration. Other factors were stronger, however. The district court pointed to the Media's interviews with jurors after the first trial, in which the media questioned jurors about whether racial factors affected the deliberation. These interviews caused widespread controversy and tension in Detroit regarding the trial. Once again, highly publicized charges were made by the Mayor that the Media's coverage of the trial was racially biased, and the Mayor commissioned an expert study, which found that the media coverage had been marked with racial overtones.

The district court could not ignore the publicity and controversy regarding the judicial proceedings. The court again spoke of its attempt to avoid a carnival atmosphere. Further, the district court explained that sequestration, though an available alternative, was still a difficult solution. The number of jurors available for a sequestration of many months was limited,

---

**2.** We note that cautionary instructions are not always an adequate solution. *See, e.g., United States v. Murray,* 784 F.2d 188, 189 (6th Cir.1986) (stating that under some circumstances, a cautionary instruction is "close to an instruction to unring a bell"); *United States v. Schiff,* 612 F.2d 73, 83 (2d Cir.1979) (finding that cautionary instruction may be insufficient to overcome prejudice to defendant).

**3.** It is possible for publicity before and during a trial to rise to a level that, unless controlled by the trial court, may deprive a defendant of his right to a fair trial under the Sixth Amendment. *See, e.g., Sheppard v. Maxwell,* 384 U.S. 333, 358, 86 S.Ct. 1507, 1519, 16 L.Ed.2d 600 (1966) (reversal where "carnival atmosphere" pervaded courtroom); *Estes v. Texas,* 381 U.S. 532, 540, 545, 85 S.Ct. 1628, 1631, 1634, 14 L.Ed.2d 543 (1965) (reversal where publicity deprived de-

fendant of "the atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms," even when jurors sequestered).

We agree with the dissent that sensational publicity does not necessarily deprive a defendant of a fair trial, nor does the broadcast of evidence necessarily interfere with a trial. To affirm the district court in this ruling, however, it is not necessary for us to conclude that the fairness of the trial actually would have been endangered or that the courtroom would in fact have become less orderly if the tapes and other materials would have been copied and broadcast. Considering that the public and press had full access to the proceedings, it is enough to find that the lower court weighed the proper factors as determined by the Supreme Court and reached a reasonable decision regarding permission to copy the tapes, transcripts and documentary exhibits.

which would seriously jeopardize the defendants' right to a fair trial. The district court again emphasized the complete openness of the trial and the preferences accorded to the Media. The district court weighed the factors and found that there was no "undue burden" on the common-law right asserted by the Media in view of the constitutional rights asserted by the defendants.

 If the district court had articulated these facts as justifications for closing the trial and excluding the Media, we would not be likely to find that such considerations outweighed the Media's constitutional right to access, under the Supreme Court's decisions in *Richmond Newspapers* and *Globe Newspaper*. When weighing the Sixth Amendment right to a fair trial against the First Amendment right to be present at criminal trials and report on them, the justifications for barring access to a trial or trial records must be compelling. *See Globe Newspaper*, 457 U.S. at 606–07, 102 S.Ct. at 2619–20. But here the Media's right at issue is the common-law right to inspect and copy public records. When weighing their common-law right to copy exhibits against the defendants' constitutional right to a fair trial and the court's desire for orderly proceedings, the district court in this case articulated and weighed appropriate factors, including a presumption in favor of granting access, and determined that the potential for public benefit was less than the potential harm to the fair and orderly administration of criminal justice. Although we might have weighed the factors differently, we do not find that the district court's balancing process constituted an abuse of discretion. As a reviewing court, we are not required to agree with a discretionary decision reached below in order to affirm it.

Regarding the separate question of the denial of transcripts at the first trial, the district court at the initial hearing had voiced concerns about the numerous errors in the transcripts, the non-record nature of the transcripts, and the fact that, if the court provided the same access that jurors had, there would have to be both a distribution and collection of transcripts during trial, which would disrupt the proceedings. The problem with the accuracy of the transcripts could have been solved by a court order to revise the transcripts, but to do that at mid-trial would have caused delay. Consequently, the district court's decision during the first trial was within the bounds of its discretion.[4]

The second trial is more problematic because inaccuracies in the transcripts could have been cured before trial and some sort of arrangement could have been made for orderly distribution of transcripts for use at trial. On balance, however, we find the court's conclusions within the range of reasonable exercise of discretion, considering that the Media had full access to all that transpired in the courtroom. Moreover, the common-law right is stated as a right to inspect and copy public records, and the transcripts here were not public records. They were not admitted into evidence, as were the tapes. *See In re The Reporters Committee for Freedom of the Press*, 773 F.2d 1325, 1338 (D.C.Cir.1985) (finding that the Supreme Court's opinion in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), demonstrates that the Court has considered admission of evidence to be crucial factor in regard to public's right of access to judicial records).

The district court granted the Media's application to inspect the documentary exhibits, and there was thus no deprivation of their right to know. The district court

---

**4.** The dissent contends that, if the district court deemed the transcripts accurate enough for the jury to use, the court can hardly conclude that they were not accurate enough to release to the public. We note that the court was able to instruct the jury that only the tapes were evidence and that, when differences occurred between the tapes and the transcript, the transcript should be disregarded. In addition, the district court was able to insure that the transcript was read simultaneously with the playing of the tapes. Those safeguards would not be present if copies of the transcript were distributed freely to the public.

refused to make a ruling in regard to permission to copy these exhibits, however, in its October 21 order. The order of June 7, 1984, is unclear. The court granted "contemporaneous access" to the documentary exhibits and ordered that the U.S. Attorney and the U.S. Marshal make the documentary exhibits "available," but the order includes no separate reference to whether copying was permitted. We presume that, as before, the documentary exhibits were available for inspection but not for copying. The documentary exhibits have not been provided to this court as part of the record, but the transcript of the hearing before the district court indicates that the documents were the contracts between the city and defendant(s), proposals made in connection with the contract, and the articles of incorporation of a company or companies involved.

The following factors affecting permission to copy the documentary exhibits were adduced at the hearing: that the proposals and contracts had been available for many months in a public records depository, that the articles of incorporation were presumably available for public inspection at the corporation's office, that two of the Detroit newspapers had already obtained copies of the documents as a result of a request under the Freedom of Information Act, that many of the documents were no longer in the depository because they had been subpoenaed by the United States Attorney, and that during the trial the witnesses had read into the record the contents of the documentary exhibits.

█ The district court stated, correctly we believe, that it could not deny the right to inspect and copy simply because the information was available elsewhere. App. at 160. It decided, however, to allow inspection but not copying of the materials. We can see no sound basis for denying permission to copy the documents. We find the court's denial of permission to copy these exhibits an abuse of discretion under the common-law right to inspect and copy.

There was little to outweigh the presumption that the public may inspect and copy public records. The exhibits were apparently business records and documents created in the course of doing business. Such records are not inflammatory. They are not inaccurate representations of other evidence. There would be little danger of misinterpretation when viewed outside the courtroom and beyond the court's cautionary safeguards. There could hardly be any danger to innocent third parties. Many of the documents were city records that were no longer available in the public depository because the government had possession of them for the purposes of its prosecution. Once the court arranged for a method for public viewing of these exhibits outside the courtroom, there could be little reason to disallow the viewers to make use of electronic means of copying. The Media had earlier assured the district court that it would perform any copying at no expense to the court. Given the absence of any substantial factor articulated by the district court in favor of denying permission to copy these materials, the refusals to grant the Media's applications, insofar as the Media was denied permission to copy the documentary exhibits as described to us, was an unwarranted infringement on the common-law right to inspect and copy.

## V.

Other courts of appeals have reviewed district court responses to requests for permission to copy audio and video tapes and transcripts of such tapes. In *United States v. Criden*, 648 F.2d 814 (3d Cir. 1981), the district court had denied the media's application for permission to copy tapes admitted into evidence, but had released the transcripts. On appeal, the Third Circuit first analyzed the different degrees of discretion exercised by a trial court, finding that a decision regarding the common-law right to copy records should not be given the same deference as a decision on an award of attorney's fees or a sentence within statutory bounds. *Id.* at 817–18. The court stated that the task of the appellate court when reviewing a re-

quest to copy tapes is to determine whether the relevant factors were considered and given appropriate weight. *Id.* at 819.

■■■ We agree with this analysis. A mere articulation of rational justifications will not suffice in this context. A district court must set forth substantial reasons for denying such requests. We agree further with *Criden* that when the conduct of public officials is at issue, the public's interest in the operation of government adds weight in the balance toward allowing permission to copy judicial records. *See Criden,* 648 F.2d at 822.

The *Criden* majority explained that, although the Supreme Court's decisions involving access to trials, such as *Richmond Newspapers,* were inapposite, the reasoning of those cases was applicable. *Id.* at 820. On this point, however, we find ourselves in agreement with the separate opinion of Judge Weis, who stated that the legal underpinnings of the two rights are significantly distinct. *See id.* at 830–833 (Weis, J., concurring and dissenting). Judge Weis wrote as follows:

> As the majority opinion admits, the right to copy court exhibits is not of constitutional derivation but springs from a common law tradition....
>
> The extended discussion of *Richmond Newspapers, Inc. v. Virginia* in the majority opinion, albeit accompanied by disclaimers, has an unfortunate tendency to conjure up constitutional confusion about the right of access at issue here. *Richmond Newspapers* focused on a constitutional right to attend a criminal trial. The distinction between attendance at a trial and access to court records was addressed by the Supreme Court in *Nixon v. Warner Communications.* The Court made clear the difference between the right to obtain information placed in the public domain through disclosure at an open trial and the right to gather the same information by copying the court records themselves.

*Id.* at 830.

We find that the policy considerations underlying the constitutional requirement of open courtrooms for criminal trials are different from the policy considerations involved in the Media's request for copies of tapes admitted into evidence and transcripts used as visual aids. The policies underlying the constitutional right to attend a criminal trial are stronger. The right to attend the trial, to see and hear the events that transpire and to publish these events, is a right that is fundamental to the protection of express constitutional guarantees in the First and Sixth Amendments. At stake is the opportunity to discover and discuss information and events.

In contrast, the policy reasons for copying tapes and transcripts are less compelling. By obtaining copies of these trial materials, the Media can increase the convenience of their news gathering and increase the vividness of their radio or television broadcasts. The Media can decrease the number of errors that might occur in a reporter's notes or a stenographic transcription. In addition, the Media can avoid the expense of sending a stenographer to attend the trial. Furthermore, the copies requested by the Media would allow an incremental increase in the quantity and quality of the transmission of the information. *See Warner Communications,* 435 U.S. at 602, 98 S.Ct. at 1314.

In the *Criden* case, the court of appeals found that the district court had accorded inappropriate weight to the danger of unfairness in that trial or in future proceedings, the probability of future trials occurring, the curative potential of voir dire, and the presumption of access. The case involved the Abscam "sting" investigation and prosecutions in which government officials were accused of taking bribes from agents posing as wealthy aliens who sought aid in immigration and other matters. *See* 648 F.2d at 815 & n. 1. After balancing the factors, the Third Circuit held that the broadcasters were entitled to copy the tapes that were played to the jury except for material that the district court determined to be impermissibly injurious to third persons. *Id.* at 829.

In *In re National Broadcasting Co.*, 635 F.2d 945 (2d Cir.1980) (involving the Abscam case of *United States v. Myers*), the Second Circuit upheld a district court's release of tapes to the media. The issue before the court was "whether television networks may copy and televise videotapes entered into evidence at a criminal trial." *Id.* at 947. The court viewed the presumption of access as an extremely strong one, declaring that only "the most extraordinary circumstances [would] justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction." *Id.* at 952. The court determined that the facts showed little chance of juror prejudice or other unfairness because about half of those summoned for jury selection had no knowledge of Abscam and only a few had more than cursory knowledge. *Id.* at 953. Potential harm in future Abscam trials was deemed speculative and could be minimized by voir dire examination. *Id.* at 953–54.

■■■ The opinion advanced logical reasons for extending the common-law right of access to the copying of tapes. We agree with the Second Circuit that the common-law right extends to tape-recordings, but respectfully disagree that only the most extraordinary reasons justify a restriction on the common-law right when such copies are requested.

In another of the Abscam cases, the District of Columbia Circuit found that the district court abused its discretion in denying permission to copy tapes played to the jury during the criminal trial. *In re National Broadcasting Co.*, 653 F.2d 609, 610 (D.C.Cir.1981) (involving the case of *United States v. Jenrette*). The court ruled that access may be denied only if the district court, after considering "the relevant facts and circumstances of the particular case", and after "weighing the interests advanced by the parties in light of the public interest and the duty of the courts", concludes that "justice so requires."

*Id.* at 613 (citations omitted). The District of Columbia Circuit has characterized the common-law right as fundamental:

The common-law right is ... fundamental to a democratic state. As James Madison warned, "A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or Tragedy: or perhaps both.... A people who mean to be their own Governors must arm themselves with the power which knowledge gives." ... [T]he right of inspection serves to produce "an informed and enlightened public opinion."

*United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C.Cir.1976), *rev'd sub nom. Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), *quoted in National Broadcasting*, 653 F.2d at 612 n. 11. This passage, however, when examined closely, speaks simply of the importance of the open availability of information.

■■■ There will be circumstances in which permission to inspect and copy records of a court will determine whether information is made public or remains hidden. When a deprivation of access to information occurs due to an exclusion from judicial records, the constitutional right to know is implicated, and it is then appropriate that this court undertake a stringent review of the lower court's decision. *See In re Knoxville News-Sentinel, Inc.*, 723 F.2d 470 (6th Cir.1983) (involving a sealed record in a case heard on documentary evidence only). Under such circumstances, where the public is barred from learning the facts of a dispute, "only the most compelling reasons can justify non-disclosure of judicial records." *Id.* at 476; *see also Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179–80 (6th Cir.1983). We find that, when the right to inspect and copy judicial records is equivalent to the right to learn the facts on record, the fundamental right to know is at stake, and consequently, the trial court's discretion must be narrowly restricted. However, when the right to make copies of tapes

played in open court is essentially a request for a duplicate of information already made available to the public and the media, then the district court has far more discretion in balancing the factors. We do not believe a fundamental right is implicated as long as there is full access to the information and full freedom to publish. In the case before us, the public and the press had the opportunity to hear the tapes in question and to inspect the documentary exhibits. The public playing of the tapes in an open courtroom was open to anyone who would draw near and listen.[5] Thus, fundamental First Amendment rights were not infringed, and only the common-law right was curtailed, in an exercise of supervisory powers.

We find that the dangers to the defendants' right to a fair trial were more grave in this case than in the Abscam cases discussed above. The district court found that the curative powers of sequestration, voir dire and cautionary instructions would be insufficient. The court found that the number of jurors who could accept sequestration for several months was so limited that the defendants' constitutional right to a fair trial would be prejudiced. It found that the increase in publicity from the audiotapes and videotapes would affect the already hostile community atmosphere to a degree that would pervade the entire community. These findings indicate that a high percentage of potential jurors would be influenced. The trial judge found that there was more than city government and possible political corruption involved in this case; there were extremely sensitive issues of racial prejudice in Detroit. The judge determined that there was a strong likelihood that impaneled jurors were likely to be affected by the passions inflamed in the community and that this furor in the community could infect the courtroom and de-

stroy the orderly, fair administration of criminal justice. The trial judge, it should be noted, was able to make first-hand observations regarding the atmosphere of the courtroom.[6]

We cannot ignore that the trial judge has primary responsibility to provide the fair trial that the Constitution guarantees. The trial judge described a local furor that could endanger the validity of the proceedings under his management. In protecting the integrity of the trial over which he presides, the judge acted to preserve the integrity of the verdict and judgment. His decision may appear overly cautious, but the primary responsibility for the orderly administration of a criminal trial rested on his shoulders. Considering that the Media had full access to the trial and complete freedom to publish, we cannot say the district court abused its discretion in its balancing of the factors prescribed by the Supreme Court. There were sufficiently weighty reasons to justify the denial of permission to make copies of the tapes under the common law.

Accordingly, we AFFIRM the order of the district court in part and REVERSE in part.

CONTIE, Circuit Judge, dissenting.

Appellants, members of the Detroit community engaged in the gathering and presentation of information to the public, appeal from orders of the district court denying both contemporaneous and post-trial access to (1) videotapes introduced as evidence in the criminal trial of former Detroit city officials, (2) transcripts of the videotapes given to the jury during the in-court playing of the tapes but not introduced into evidence, and (3) documentary exhibits not

---

**5.** The record does not indicate that any member of the public or press was turned away from the courtroom.

**6.** The trial judge is also in a position to determine the extent to which publicity has been deliberately manufactured in order to manipulate the judicial process and to consider that

factor in making the decision to grant or deny permission to inspect and copy exhibits. The dissent states that it would be unfortunate to allow public officials to exert such control on the federal courts. We do not think the federal courts are so easily manipulated.

introduced into evidence.[1] The defendants filed no brief in this appeal, and the government sought dismissal of the appeal on the ground of mootness. While concurring in the majority's conclusion that the case is not moot[2] and that the district court erred in denying access to documentary evidence, I conclude that the First Amendment and the public's common law right of access to public and judicial records requires the district court to grant the public access to the transcripts and tapes sought in this case.

## I.

This appeal is a consolidation of the appellants' appeals of several orders of the district court denying public access to the records at issue in this case. The district court asserted several grounds for denying the public's multiple applications, and, prior to review of the law in this area, I will review those orders. The district court also filed a memorandum opposing the press' application for a writ of mandamus. The district court cited the following:

(1) The applications for access were made after the jury had been impaneled, and, therefore, it was impossible to sequester a jury since the jury had not been questioned with regard to sequestration at the *voir dire.*

(2) No First Amendment issues were implicated by the application.

(3) The transcripts were not evidence and could not be corrected by a cautionary instruction when communicated to the public by the appellants.

(4) A cautionary instruction to the jury, while adequate to protect against jury exposure to reports of the trial, would not protect against exposure to the tapes.

(5) Allowing access to the tapes "would transform this already highly publicized trial into an entertaining carnival."

(6) In light of charges by the Mayor that media coverage of the prosecution was racially motivated, "the present community climate will become fragile if the tapes are made available to the press prior to the jury reaching a verdict." If race becomes an issue in the public's mind, "the court cannot protect the jury from its fallout," and defendants would not receive a fair trial.

(7) Appellants would be more likely to misinform the public in reporting from the tapes than from their own observations of the trial. The district court reasoned:

> There is a difference between accurately reporting an event that occurs in the courtroom, and taking a tape, subject to the media's editorial prerogatives, and playing it on the television. There is a misleading aura of accuracy

---

1. Appellants' status as members of the news media in no way diminishes their rights as members of the community, but instead casts them as representatives of the public. "Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 572–73, 100 S.Ct. 2814, 2824–25, 65 L.Ed.2d 973 (1980). *See also id.* at 577 n. 12, 100 S.Ct. at 2827 n. 12.

2. *See Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 765 (1978); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546–47, 96 S.Ct. 2791, 2796–97, 49 L.Ed.2d 683 (1976); *Weinstein v. Bradford,* 423 U.S. 147, 149,

96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *United States v. Peters,* 754 F.2d 753, 758 (7th Cir.1985); *United States v. Kerley,* 753 F.2d 617, 618 n. 1 (7th Cir.1985); *United States v. Yonkers Board of Education,* 747 F.2d 111, 112 (2d Cir.1984); *In re Knight Publishing Co.,* 743 F.2d 231, 233 (4th Cir.1984); *United States v. City of Detroit,* 720 F.2d 443, 449 (6th Cir.1983); *Newman v. Graddick,* 696 F.2d 796, 800 (11th Cir.1983); *United States v. Brooklier,* 685 F.2d 1162, 1165 (9th Cir.1982); *United States v. Edwards,* 672 F.2d 1289, 1292 (7th Cir.1982); *In re Application of National Broadcasting Company (Myers),* 635 F.2d 945, 949 n. 1 (2d Cir.1980); *United States v. Gurney,* 558 F.2d 1202, 1207 (5th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978); *United States v. Schiavo,* 504 F.2d 1, 5 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974).

to a tape recording, and a good faith edit on the part of the media can present a completely different picture to the public than what it would have seen if it had been in court that day. On the other hand, a competent reporter can easily convey to the public the information that it needs to know concerning the trial.

On October 17, 1983, the district court issued an order denying applicants' application for contemporaneous access to the tapes. Applicants moved for clarification on the ground that the order did not deal with their request for transcripts and copies of exhibits. A hearing was held on October 19 at which the court denied access to transcripts on the ground that "I think it is going to telegraph to that jury that this Court is taking steps to give the media what it is not giving to the person sitting in the last row ...", and that "[w]hat is being published is the Government's view of what these tapes say, and I have just noted too many errors to permit that." On October 21, 1983, the court issued an order allowing appellants to inspect and examine the exhibits at the end of each trial day, but did not rule on whether the appellants could copy the exhibits.

On about December 13, 1983, the first jury was dismissed after reaching a verdict of guilty as to three defendants and failing to reach a conclusion with respect to the others. On January 6 and 13, 1984, appellants again sought access to the tapes on retrial of the defendants who had not been convicted. On June 7, 1984, the district court issued an order denying access on the following grounds:

(1) No common law right of access to the transcripts existed.

(2) Granting access to the tapes would create such a tense community environment that sequestration would be required. So few jurors are available for sequestration that defendant's right to a jury representative of the community would be jeopardized.

(3) Access to the transcripts would implicate innocent third parties.

(4) "[R]egardless of the media's motivations, selective publication of these tapes necessitated by media limitations of time and space would assure that the second trial would be conducted in a carnival atmosphere that would permeate the actual proceedings despite the best intentions of all involved."

The court granted the media the right to examine exhibits at the close of each day.

## II.

Appellants' right of access to the materials in the case is found in both the First Amendment and the common law. While neither right is absolute, similar standards govern the evaluation of the appellants' right of access regardless of its foundation. Accordingly, I review below the sources of appellants' right of access and the factors that I believe require a grant of access in this case.

### A.

The First Amendment expressly limits government regulation of the free flow of information and ideas. The Amendment in no way expressly qualifies this limitation with reference to the source or type of information, and, in fact, the Amendment "encompass[es] those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982). The Amendment assures "freedom of communication on matters relating to the functioning of government." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575, 100 S.Ct. 2814, 2826, 65 L.Ed.2d 973 (1980); *Globe Newspaper Co.*, 457 U.S. at 604, 102 S.Ct. at 2618; *Mills v. Alabama*, 384 U.S. 214, 218 (1966). "By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co.*, 457 U.S. at 604, 102 S.Ct. at 2618. *See Press Enterprise Co. v. Su-*

*perior Court of California,* 464 U.S. 501, 516–18, 104 S.Ct. 819, 827–28, 78 L.Ed.2d 629 (1984) (Stevens, J., concurring). While this right of information about government has most often arisen in the context of access to criminal trials, the Court has never expressly limited the right of communication about governmental matters to that context. Nor has the Court held that this right of communication is limited to presence at trial and does not extend to the inspection and copying of the information in question. Perhaps the ultimate inquiry is whether the access sought by the public "makes a positive contribution to this process of self-governance." *Id.* at 518, 104 S.Ct. at 828.

I am convinced that this case implicates the public right to information about the functioning of its government and the process of self-governance. The prosecution involves a city official charged with illegal conduct in the course of conducting public business. The mayor of Detroit has, according to the district court, commented extensively on the prosecution. The prosecution reveals the work of law enforcement officials, and, like any criminal trial, facilitates public examination of the judicial branch of government. Few cases exist where the public interest in information about government is more strongly and directly implicated. *See United States v. Smith,* 776 F.2d 1104 (3d Cir.1984).[3] *See also Fraternal Order of Police Lodge No. 5 v. City of Philadelphia,* Case No. 85–6073 (E.D.Pa., November 5, 1985) [Available on WESTLAW, DCTV database].

Further, the fact that the public may have an alternative avenue of access to the information has never been deemed sufficient to automatically justify denial of information. In *Globe Newspapers,* the public sought access to a criminal sex-offense trial during the testimony of minor victims. Neither the majority nor the dissent concluded that the First Amendment did not apply to the restriction on public informa-

tion simply because the public had access to the public record of the witness' identification and transcript of testimony. The majority concluded that where the government, as in this case, "attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper,* 457 U.S. at 606–07, 102 S.Ct. at 2619–20. "Such circumstances will be rare." *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984). *See also Society of Professional Journalists v. Secretary of Labor,* 616 F.Supp. 569, 577–78 (D.Utah 1985) ("Even if there is no purposeful tampering with the transcript, the full flavor of the hearing cannot be sensed from the sterile sheets of the transcript. Emotions, gestures, facial expressions, and pregnant pauses do not appear on the reported transcript.... Much of what makes good news is lost in the difference between a one-dimensional transcript and an opportunity to see and hear testimony as it unfolds."). The Court held that where the public had access to the transcript of the proceeding, the state's interest in denying access to the proceeding itself was diminished. *Globe Newspaper,* 457 U.S. at 610, 102 S.Ct. at 2622. The dissent recognized that such restrictions do affect First Amendment rights, but would review such restrictions for reasonableness only. *Id.* at 616, 102 S.Ct. at 2625 (Burger, C.J., dissenting).

That the public had access to the courtroom is not, of course, irrelevant to our consideration of the governmental interest in this case and the means to vindicate such interest. However, it must be recognized that, as in *Globe Newspaper,* there has been a denial of public access to information essential to public communication regarding the functioning of government. Access to a copy of the tapes in question, like the difference between a transcript and live testimony, is qualitatively different

---

**3.** Regarding civil cases, see *In re Reporters Committee for Freedom of the Press,* 773 F.2d 1325

(D.C.Cir.1985).

from news reports of members of the public present in court when the tapes were presented. Accordingly, the restriction on public access to information essential to the process of self-governance may be upheld against a First Amendment challenge only upon a showing that the restrictions applied are the least burdensome manner of vindicating a compelling governmental interest.[4]

### B.

Public access to public records is guaranteed not only by the First Amendment, but by common law as well. In *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), the Court recognized "a general right to inspect and copy public records and documents, including judicial records and documents." 435 U.S. at 597, 98 S.Ct. at 1311 (footnotes omitted). Such right is not absolute, and records cannot be " 'used to gratify private spite or promote public scandal,' " nor "serve as reservoirs of libelous statements," or "as sources of business information that might harm a litigant's competitive standing." *Id.* at 598, 98 S.Ct. at 1311. Further, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 599, 98 S.Ct. at 1312 (footnote omitted).

The courts have recognized that "there is a strong presumption that material introduced into evidence at trial should be made reasonably accessible in a manner suitable for copying and broader dissemination," and that "generally the right to copy has been considered correlative to the right to inspect." *United States v. Criden (Criden I)*, 648 F.2d 814, 823 (3d Cir.1981); *United States v. Guzzino*, 766 F.2d 302, 304 (7th Cir.1985). *See United States v. Peters*, 754 F.2d 753, 763 (7th Cir.1985); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984); *United States v. Edwards*, 672 F.2d 1289, 1294 (7th Cir.1982); *In re Application of National Broadcasting Co. (Jenrette)*, 653 F.2d 609, 612–13 (D.C.Cir.1981); *In re Application of National Broadcasting Co. (Myers)*, 635 F.2d 945, 949–50 (2d Cir.1980); *United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C.Cir.1976), *rev'd sub nom. Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *In re Application of WFMJ Broadcasting Co.*, 566 F.Supp. 1036, 1041 (N.D. Ohio 1983). *See also United States v. Smith*, 776 F.2d 1104 (3d Cir.1985); *United States v. Hickey*, 767 F.2d 705, 708 (10th Cir.1985); *United States v. Rosenthal*, 763 F.2d 1291, 1293 (11th Cir.1985). "When physical evidence is in a form that permits inspection and copying without any significant risk of impairing the integrity of the evidence or interfering with the orderly conduct of the trial, only the most compelling circumstances should prevent contemporaneous public access to it." *Myers*, 635 F.2d at 952 (footnotes omitted); *Jenrette*, 653 F.2d at 615 ("restricting the common law right to inspect and copy judicial records is rarely the proper protection"); *United States v. Mouzin*, 559 F.Supp. 463, 465 (C.D.Cal.1983) ("the potential harm must not be capable of resolution by a means less drastic than denial of access"). Further, "the presumption of access normally involves a right of *contemporaneous* access." *In re Continental Illinois Securities Litigation*, 732 F.2d 1302, 1310 (7th Cir.1984) (emphasis in original). *See In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.") (footnote omitted);

---

4. While recognizing the principles set forth in footnote one of the majority opinion, I believe that the compelling facts of this case involving corruption in government and the fact that much of the affected public will, due to prac- tical limitations, inevitably receive "less than the original, first-hand genuine article" require a grant of access to the transcripts and tapes in order to avoid rendering the public's First Amendment rights meaningless.

*Myers,* 635 F.2d at 952. Denial of contemporaneous access "would result in denial of the right to copy at a time when the issues remained a matter of public interest. Thus the educational and informational value of public observation of the evidence would never be available at a meaningful time." *Criden I,* 648 F.2d at 827; *Mitchell,* 551 F.2d at 1262 n. 42 ("A portion of the news value of such materials may be irrevocably lost by even a temporary delay."). The Supreme Court has recognized that "[a]s a practical matter ... the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly." *Nebraska Press Ass'n,* 427 U.S. at 561, 96 S.Ct. at 2803.

Given the strong common law presumption in favor of public access to judicial records, the burden of rebutting or overcoming the presumption falls on the party opposing access, in this case, the government. *United States v. Miller,* 579 F.Supp. 862, 866 (S.D.Fla.1984); *WFMJ,* 566 F.Supp. at 1043; *Mouzin,* 559 F.Supp. at 466; *In re Application of CBS, Inc.,* 540 F.Supp. 769, 771 (N.D.Ill.1982).

A district court which denies access in the face of the strong common law presumption favoring access must articulate its reasons for such denial with specificity. *In re Knight Publishing Co.,* 743 F.2d 231, 234 (4th Cir.1984); *Edwards,* 672 F.2d at 1294; *Criden I,* 648 F.2d at 829. While we review the decision of the district court for abuse of discretion, it is clear that "[t]he mere statement that a decision lies within the discretion of the trial court does little to shed light on its reviewability. It means merely that the decision is uncontrolled by fixed principles or rules of law." *Criden I,* 648 F.2d at 817. *See Brown & Williamson,* 710 F.2d at 1177; *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423, 430 (5th Cir.1981); *Jenrette,* 653 F.2d at 613; *WFMJ,* 566 F.Supp. at 1040. In *In re Knoxville News-Sentinel Co.,* 723 F.2d 470, 476 (6th Cir.1983), we noted that "the district court's decision is not accorded the traditional scope of 'narrow review reserved for discretionary decisions based on

first-hand observation.'" Rather, we adopted the following view of the abuse of discretion standard to govern our review of right-to-access cases.

"To say that discretion exists, however, is not to say, as appellee contends, that what is involved here 'is simply a policy determination.' Appellants seek to vindicate a precious common law right, one that predates the Constitution itself. While the courts have sanctioned incursions on this right, they have done so only when they have concluded that justice so requires. To demand any less would demean the common law right."

*Id.* at 476 (quoting *Mitchell,* 551 F.2d at 1260).

### C.

Four factors gleaned from the recently developed case law in this area convince me that the district court's restriction of public access to judicial records constituted an abuse of discretion and that no compelling state interest necessitated the restriction on access pursuant to both the First Amendment and common law. First among these is the fact that the prosecution in this case involved public officials, the monitoring of which both the First Amendment and common law right of access are intended to facilitate. Second, the right of public access is heightened in criminal judicial proceedings. Third, the parties in the district court failed to convincingly establish that the defendants' right to a fair trial could be protected only by denying access to the records. Fourth, the district court failed to specifically articulate how release of the tapes would injure innocent third parties. These four factors are considered below.

### 1.

Our history of public access to government informs our analysis of this case. *Richmond Newspapers,* 448 U.S. at 564–70, 100 S.Ct. at 2820–23. The public's interest in the functioning of its government certainly ranks among the highest when communication of information is con-

cerned, and a quest for knowledge should not be blocked, especially when the public seeks "access to places traditionally open to the public." *Id.* at 577, 100 S.Ct. at 2827. *See id.* at 575, 100 S.Ct. at 2826 ("These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government."). *See Press Enterprise,* 464 U.S. at 518, 104 S.Ct. at 828 (Stevens, J., concurring).

Other circuits have agreed that where corruption in government is the focus of the proceeding in issue, this factor weighs against limitations on the traditional right of public access. *United States v. Martin,* 746 F.2d 964, 969 (3d Cir.1984); *Jenrette,* 653 F.2d at 614; *Criden I,* 648 F.2d at 822; *Myers,* 635 F.2d at 952 ("The presumption is especially strong in a case like this [AB-SCAM] where the evidence shows the actions of public officials...."). *See WFMJ,* 566 F.Supp. at 1041; *In re CBS,* 540 F.Supp. at 771–72. Accordingly, this factor strengthens the strong presumption in favor of public access to public records, and highlights the applicability of the First Amendment when the records in question expose the conduct of government officials.

**2.**

History and case law highlight the heightened public interest in access to criminal proceedings. The interest in access applies equally to records of criminal proceedings. "[A] presumption of openness inheres in the very nature of a criminal trial under our system of justice." *Richmond Newspapers,* 448 U.S. at 573, 100 S.Ct. at 2825. "Plainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Id.* at 575, 100 S.Ct. at 2826. The review of the First Amendment right of access to criminal proceedings in *Richmond Newspapers* is just as applicable to the problem of access to public records. The Court reasoned:

> The early history of open trials in part reflects the widespread acknowledgment, long before there were behavioral scientists, that public trials had significant community therapeutic value. Even without such experts to frame the concept in words, people sensed from experience and observation that, especially in the administration of criminal justice, the means used to achieve justice must have the support derived from public acceptance of both the process and its results. When a shocking crime occurs, a community reaction of outrage and public protest often follows.... Thereafter the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion....
>
> ... The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is "done in a corner [or] in any covert manner." *Supra* at 567 [100 S.Ct. at 2822]. It is not enough to say that results alone will satiate the natural community desire for "satisfaction." A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's criminal process "satisfy the appearance of justice," ... and the appearance of justice can best be provided by allowing people to observe it.

*Id.* at 570–72, 100 S.Ct. at 2823–24.

Accordingly, a grant of access in this case would promote the necessary community cartharsis and allow an open airing, in light of all the evidence and charges of racism, and a complete examination of the judicial process by the public.

**3.**

While the most troubling aspect of this case is the contention that public access will necessarily deprive a defendant of the right to a fair trial, "speculative threats to that right have never been sufficient to overcome either first amendment rights to attend and report on trials ... or the common law right of access to trial materials."

*Martin*, 746 F.2d at 972; *Edwards*, 672 F.2d at 1294 (cannot deny access on basis of "unsupported hypothesis or conjecture"); *Jenrette*, 653 F.2d at 616; *Myers*, 635 F.2d at 953; *Mitchell*, 551 F.2d at 1261 ("the '*risk* of causing *possible* prejudice' at a *hypothetical* second trial does not justify" denial of access); *Mouzin*, 559 F.Supp. at 467. *But see Belo*, 654 F.2d at 431. Denials of access often involve resort to colorful language, raising the specter of a trial turned into a "carnival," *a la Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). However, *Sheppard* does not stand for the proposition that excess publicity alone threatens a fair trial. The Court in *Sheppard* emphasized that the publicity surrounding the case to which the jurors were exposed was dominated by material (1) not presented in court, and (2) inadmissible as evidence. *Id.* at 351, 360, 86 S.Ct. at 1516, 1521. Accordingly, the courts have concluded that the admission of a videotape into evidence is a substantial safeguard to a defendant's right to a fair trial. *Jenrette*, 653 F.2d at 614; *Myers*, 635 F.2d at 952 ("Once the evidence has become known to the members of the public ... through their attendance at a public session of court, it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance...."); *Mitchell*, 551 F.2d at 1262 n. 43; *WFMJ*, 566 F.Supp. at 1042 ("The public need not be shielded from information which has been deemed to be reliable enough to be presented to the jury."). Accordingly, the fact that the tapes were admitted as evidence minimizes the threat of deprivation of the defendants' right to a fair trial.

One of the district court's principal objections to allowing the public to see the tapes was that such would inevitably require sequestration of the jury. The district court's theory requires that we assume that the jury could follow the court's admonition with respect to reported descriptions of the tapes, but could not follow that admonition if the tapes themselves were available to the media. This theory has been soundly rejected by courts which are

unwilling to lightly conclude that jurors will disregard the court's admonition. Arguments such as that accepted by the district court "rest on a speculative assumption that the jury, which already has been empaneled will not abide by this court's admonition to avoid all publicity about this case.... Confidence that jurors will obey instructions of the court is an underpinning of our criminal justice system.... There is no reason to believe that the jury will disobey this Court's instruction to avoid publicity...." *Mouzin*, 559 F.Supp. at 461; *Myers*, 635 F.2d at 953 n. 8; *WFMJ*, 566 F.Supp. at 1042 ("this Court cannot find that release of the tapes will increase the likelihood that the jury will disregard its instructions").

With respect to future retrials, it is clear that "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n*, 427 U.S. at 554, 96 S.Ct. at 2800; *Chandler v. Florida*, 449 U.S. 560, 575, 101 S.Ct. 802, 810, 66 L.Ed.2d 740 (1981). "Recent highly publicized cases indicate that even when exposed to heavy and widespread publicity many, if not most, potential jurors are untainted by press coverage." *CBS, Inc. v. United States District Court*, 729 F.2d 1174, 1179 (9th Cir.1984). "[I]t is not enough that publicity might prejudice one directly exposed to it. If it is to be restrained, the publicity must threaten to prejudice the entire community so that twelve unbiased jurors cannot be found." *Id.* at 1180; *Myers*, 635 F.2d at 953 ("Even the intensive publicity surrounding the events of Watergate, very likely the most widely reported crime of the past decade, did not prevent the selection of jurors without such knowledge of the events as would prevent them from serving impartially.").

Further, there are numerous tools available to a trial court to guard against prejudice in the pending proceeding and in potential retrials after appeals. These tools, including change of venue, continuances, and voir dire, are less restrictive alternatives than banning public access to traditionally and presumptively open records.

*Martin,* 746 F.2d at 973. *See CBS, Inc.,* 729 F.2d at 1179–80 (use instructions, voir dire); *Edwards,* 672 F.2d at 1295–96 (cautionary instructions); *Jenrette,* 653 F.2d at 616, 617 n. 45; *Criden I,* 648 F.2d at 828 (voir dire); *Myers,* 635 F.2d at 953. *But see In re Gannett News Service, Inc.,* 772 F.2d 113 (5th Cir.1985).[5]

I would not hold that a trial court could never restrict public access to public records. However, the orders of the district court simply lack the articulable specifics indicating that release of the tapes would deprive defendants of a fair trial and that no less restrictive means of dealing with the attendant publicity was viable.[6]

### 4.

The district court also alleged in conclusory terms that granting access to the tapes would affect the rights of innocent third parties. While this factor is one that the district court may properly consider, *Jenrette,* 653 F.2d at 619–20; *In re Application of KSTP Television,* 504 F.Supp. 360, 363–64 (D.Minn.1980), the district court's conclusions in this regard are so devoid of specificity that review of this argument is practically precluded. Further, the proper remedy when innocent third parties are involved and may be legitimately protected, is not to suppress the tapes, but rather to excise those portions of the tape implicating innocent third parties. Accordingly, I would remand the case to the district court to either release the tapes or to excise those portions implicating innocent third parties.

### III.

In light of the aforementioned factors, I conclude that the district court erred in denying the public access to the audio and video tapes and transcripts.

Initially, it is clear that the right of access applies to both electronic and paper records. *Belo,* 654 F.2d at 429; *Myers,* 635 F.2d at 950; *Mitchell,* 551 F.2d at 1258 n. 21; *WFMJ,* 566 F.Supp. at 1040; *Shannon,* 540 F.Supp. at 771 n. 3. Although several district courts have granted the public access to transcripts, the courts have rejected the argument that transcripts obviate the need for access to the tape where the tape is the actual record introduced into evidence.[7] "The public is entitled to access to evidence introduced at trial in the form in which that evidence has already been seen and heard by persons attending the trial." *WFMJ,* 566 F.Supp. at 1042. *See Criden I,* 648 F.2d at 824 ("There can be no question that actual observation of testimony or exhibits contributes a dimension which cannot be fully provided by second-hand reports.... However, such publicity, rather than favoring rejection of the application, may in fact support its grant, absent compelling reasons to the contrary."); *Myers,* 635 F.2d at 952 ("Though the transcripts of the videotapes have already provided the public with an opportunity to know what words were spoken, there remains a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that records the

---

5. The district court found that the tense climate of racism arose out of the Mayor's charges that the coverage of the case was racially motivated. The district court's orders in this case are, therefore, plainly predicated on the Mayor's criticism of the public's reaction to prosecution of a city official. The district court, unwittingly, perhaps, proceeded through its orders to mute open public debate by severely limiting the number of citizens with primary access to the evidence. It is plain that the increasingly second-hand nature of the information supplied to the public would foster misinformation, rumor, and confusion, rather than the unfettered discussion engendered by tossing the tapes, transcripts, and other circumstances of trial into the public arena.

6. I disagree with the majority's assertion that our review is limited to deciding whether "the lower court weighed the proper factors ... and reached a reasonable decision." Opinion at n. 3. The district court clearly failed to consider alternative means of protecting the fairness of the trial in a manner less burdensome to the First Amendment rights of the Detroit community.

7. One court has concluded that the provision of transcripts to the public is a factor to be considered in deciding the access issue with respect to the tapes. *Belo,* 654 F.2d at 432. However, in this case, the court provided neither transcripts nor tapes.

activities of a member of Congress and local elected officials, as well as agents of the Federal Bureau of Investigation."); *WFMJ*, 566 F.Supp. at 1043 ("The broadcasters have suggested that members of the public should have their own opportunity to evaluate these elements themselves by listening to the inflection in the voices of those recorded, as well as their tone of voice, their delivery and the timing of their remarks. In these areas, the Court agrees, the actual recordings are certainly more accurate than a transcript."). *See also Richmond Newspapers*, 448 U.S. at 597 n. 22, 100 S.Ct. at 2838 n. 22 (Brennan, J., concurring) ("[T]he availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom."). Accordingly, I conclude that the district court abused its discretion in denying the public access to the electronic records.

More problematic is the issue of transcripts of the tapes, which were not admitted as evidence. Some courts have denied access to transcripts since they are not evidence, although granting access to the tapes, *WFMJ*, 566 F.Supp. at 1042, while other courts have released transcripts and used this, often unsuccessfully, as a justification for denying access to the tapes. *See Belo*, 654 F.2d at 432. The district judge's concern that the fact that the tapes were prepared by the government and were not exactly correct is entitled to consideration. One court has analyzed this issue as follows:

> Although representatives of the media were present at the trial and were able to take notes on the recorded conversations as they were played to the jury, this procedure has obvious limitations. The public interest can best be vindicated by the release of complete and accurate transcriptions, at the expense of the me-

dia applicants. We therefore hold that the strong presumption in favor of public access applies to these transcripts.

> In so holding we do not suggest that the fact that requested materials are not in evidence can never be a *relevant* consideration, we hold only that the district court erred in treating it as a *dispositive* consideration. *Cf. In re Application of National Broadcasting Co.*, 653 F.2d 609, 614 (D.C.Cir.1981). Where proffered evidence is found inadmissible because it is unreliable, or because it is more prejudicial than probative, the dangers of broad dissemination may substantially outweigh any benefits. This is not such a case—the requested transcripts were deemed sufficiently reliable and helpful to be given to the jury. In these circumstances the fact that the transcripts are not in evidence carries little weight.

*Martin*, 746 F.2d at 968–69.

The possibility that the transcripts are inaccurate is best resolved by granting the public full access to both the tapes and the government's transcribed version of such. This facilitates the public's role of monitoring the courts in dispensing justice and allows the public to consider first-hand any government misconduct in preparing such transcripts. Public confidence in the meting out of justice is hardly bolstered when transcripts deemed too unreliable for public release, are handed to the jury as an aid in determining innocence or guilt beyond a reasonable doubt where consequences involve the deprivation of the defendant's property, liberty, and in some instances, life. Since the transcripts were deemed reliable enough to give to the jury as an aid in following the tapes, and since the district court failed to specifically cite instances of incorrect transcriptions of the tapes, it was an abuse of discretion to deny the public access to the transcripts.[8]

---

8. The majority notes that the safeguards (cautionary instructions, contemporaneous viewing/reading of tapes and transcripts) used to regulate jury consideration of evidence are not available when material is presented to the pub-

lic. To require the application of such procedural devices when evidence is reported to the public would, in my view, constitute an extraordinarily strained and unbalanced resolution of

## IV.

In accordance with the above analysis, I conclude that the absolute denial of access in this case violates both the First Amendment and the common law right of access to judicial records. The government, while proffering several interests entitled to consideration—those of the defendant and innocent third parties—fails to proffer an interest in the context of this case which is both compelling and which could not be furthered in a less restrictive manner than an absolute denial of access. Accordingly, the district court's denial of access constitutes a violation of the First Amendment and a gross abuse of discretion with respect to the abridgment of appellants' common law right of access. I do not suggest, of course, that copying need occur simultaneously or that copying, like the broadcast of a trial, is not subject to reasonable time, place or manner restrictions.[9] Likewise, the public's responsibility in handling the material is not dispositive. "Confidence in the responsibility of the media must prevail until reason is given to find likewise. Admittedly, the media has been known to behave irresponsibly at times; however, barring them access for that reason is not only personally repugnant to this court, but is also inimicably hostile to our way of life." *WFMJ*, 566 F.Supp. at 1043. *See Guzzino*, 766 F.2d at 304.

Accordingly, the judgment of the district court should be REVERSED.

---

the interplay between the First and Sixth Amendment rights at issue here.

9. *Globe Newspapers Co.,* 457 U.S. at 607 n. 17, 102 S.Ct. at 2620 n. 17; *Richmond Newspapers,* 448 U.S. at 581 n. 18, 100 S.Ct. 2830 n. 18; *Myers,* 635 F.2d at 952 n. 7.