UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony J. PETERS, et al.,
Defendants-Appellees.

Appeal of the HEARST
CORPORATION.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony J. PETERS, et al.,
Defendants-Appellees.

Appeal of NEWSPAPERS, INC., et al.

Nos. 84–1723 & 84–1724.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1984.

Decided Feb. 8, 1985.

---

Matthew J. Flynn, Quarles & Brady, Ralph J. Ehlinger, Meissner, Tierney, Ehlinger & Whipp, S.C., Milwaukee, Wis., for defendant-appellant.

Irvin B. Charne, Charne, Glassner, Tehan, Clancy & Taite, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, BAUER, and WOOD, Circuit Judges.

BAUER, Circuit Judge.

This case involves the appeals of television and radio subdivisions of the Hearst Corporation located in Milwaukee, Wisconsin, of Newspapers, Inc., the publisher of the *Milwaukee Sentinel,* and of Michele Derus, a reporter for the *Sentinel,* from an order of the district court excluding the public and the media from the voir dire of prospective jurors in the case of *United States v. Anthony Peters, et al.,* and from an order excluding Derus from access to admitted exhibits during the pendency of the *Peters* trial. We vacate both the closure order and the Derus exclusion order and declare that the closure and exclusion were erroneous.

I

In the case underlying this appeal, *United States v. Peters,* No. 83 CR 60 (E.D.Wis. 1984), the defendants were charged with various offenses related to the distribution of cocaine. The Milwaukee media extensively publicized the arrests of the defendants and other pretrial events in this case. The voir dire of prospective jurors began on April 16, 1984 after the trial judge denied a defense motion to close the voir dire of prospective jurors to the public and the press. In seeking closure, defense counsel referred to the fact that prospective jurors were being questioned individually while the rest of the venire waited in a separate room, and stated that "it's not going to do a lot of good to have all those jurors sitting in the other room not hearing what happened in this room if they can go home tonight and read about it." Tr. at 4/16/84, 103. Although Judge Warren denied defense counsel's motion, he agreed to question each prospective juror on the subject of pretrial publicity. On April 16 three of the seven potential jurors questioned about pretrial publicity were dismissed for cause.

On April 17, the *Milwaukee Sentinel,* a morning newspaper, published an article written by Michele Derus describing the April 16 voir dire. Included in the text of the article were quotations of responses given by three dismissed individuals to in-

quiries about pretrial publicity. Neither names nor personal backgrounds of the prospective jurors were included in the April 17 article. On April 17, the second day of voir dire, one of the defendants renewed his motion to sequester the panel of over ninety prospective jurors citing the *Sentinel* article as grounds. One of the counsel for the defense conceded that the trial judge had instructed the jury not to read the newspapers, but asserted that such an instruction would be ineffective to secure an impartial jury. The judge refused to reconsider his original ruling. Another defense counsel, however, renewed the motion to close the voir dire on the grounds that the *Sentinel's* reporting had been allegedly irresponsible, arguing that "the danger of contaminating or interfering with free questions and answers and exchange of information on the individual voir dire is seriously impeded by this type of journalism." Tr. at 4/17/84, 110. Counsel argued that Derus' stories were "not accurate" and based on "hearsay."[1] A third defendant's counsel joined in the motion to close the voir dire. Although the judge noted that there was only one reporter and an artist in court at the time of the motions for closure on the morning of April 17, apparently implying that the defendants' concerns about publicity therefore might be unfounded, the court nonetheless granted the defense motion for closure because of his "concern for the degree to which the voir dire examination of potential jurors has been reported in the newspapers while the case is going on." The court also stated that he "was a little bit chagrined ... that some of the answers of the individual prospective jurors were in the newspaper." Referring to *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the court indicated that he'd "have to take as narrow a solution as possible." Finally, the court ordered that the transcript of the voir dire be "made available at court expense ... to anybody that seeks it in the public record

in the clerk's office after the voir dire is closed and the jury is formed."

The court then cleared the courtroom of members of the public and the media. The court made no inquiry to ascertain whether any prospective juror had read or heard about the *Sentinel* article. Neither Derus nor any attorneys representing the media were present to argue against the motion. On the afternoon of April 17, counsel for the *Sentinel* appeared and moved the court to reconsider its closure order, but the court denied this motion.

Attorneys for the various appellants appeared before the court to argue against the closure on April 18, but the court repeatedly refused to vacate his order and open the voir dire to the public. All subsequent voir dire proceedings regarding pretrial publicity were conducted *in camera*. The voir dire proceedings were concluded on April 20, 1984.

On April 20, a panel of this court denied as moot the Hearst Corporation's petition for mandamus to direct the trial judge to open the voir dire. On May 9, 1984, the same panel granted the Hearst Corporation's petition for a rehearing, vacated its original order, and denied the petition for a writ of mandamus because review of the district court's closure order would be entertained more appropriately through an appeal on the merits.

The jury trial in *Peters* began April 23, 1984, and concluded with a jury verdict on May 12, 1984. The jury heard the case without being sequestered until May 5th, on which day another article written by Derus appeared in the *Sentinel*. That article recited information contained in two documents which had been marked and used in an attempt to impeach a government witness during the *Peters* trial on May 3rd, but which had not been offered and received into evidence. The documents, which were summaries of statements made by the witness to federal in-

---

1. The accuracy or sources of news stories really have not a thing to do with the problem of jury contamination. Indeed, the subsequent motion that led to the sequestration was based precisely on the *accuracy* of the stories.

vestigators, had been included in a stack of exhibits shown to Derus on Friday afternoon by one of the trial judge's law clerks who was unfamiliar with the case. The article quoted portions of the documents which identified five major league baseball players, two of whom were members of the Milwaukee Brewers, as allegedly having purchased cocaine from one of the defendants. The jury had heard testimony to the effect that professional athletes had been customers of that defendant, but those athletes had not been identified to the jury.

During a hearing on the morning of May 5, of which appellants were not notified and at which appellants were not present, the court ordered the jury sequestered as a result of the *Sentinel* article. In the course of the hearing to determine whether the jurors had seen or been influenced by the *Sentinel* article, the court also announced that for the duration of the trial, the trial exhibits would be made available to the public and the media only in the chambers of the trial judge between 8:30 and 9:00 a.m. on trial days. On each of the mornings of May 8, 9, and 10, Derus attempted to see the exhibits but each time she was told that the judge had instructed his staff to refuse to let her see the exhibits and that she was the only person barred from seeing them. On May 10th, the judge denied appellant's motion to vacate the court's order denying Derus access to the exhibits, stating "I don't have any doubt whatsoever that a court with an on-going criminal trial in process has the ability to and the power to control access to documents just in terms of case management." Tr. at 5/10/84, 204. The court implied that Derus had deliberately consulted only the law clerk unfamiliar with the case in order to gain access to the unadmitted exhibits, stating that he considered that conduct "a breach of proper etiquette, a breach of ethics, and a breach of trust." The court closed by noting that the press had a right to exercise "the very strong first amendment rights," and that his office had always tried to "honor the rights of the press," but that he believed that "the responsibility that goes with" the exercise of first amendment rights had not been shown in this case.

On appeal both the Hearst Corporation and Newspapers, Inc. challenge the district court's order closing the voir dire and Newspapers, Inc. challenges the court's order barring Derus from viewing the trial exhibits. Both appellants ask this court to vacate the district court's closure order and exclusion order and declare that those orders were in error. Because none of the defendants in *United States v. Peters* filed a brief in this matter, and because the government in its brief indicates that it takes no position on the correctness of the orders entered by the trial judge, except insofar as it cites at length from the statement of policy of the United States Department of Justice which advocates generally that the government exercise an "affirmative duty" to oppose the closure of judicial proceedings, this court asked Attorney Irvin B. Charne of Milwaukee to file a brief and argue as amicus in support of the trial court's decision. We appreciate Mr. Charne's efforts in this case and thank him for his assistance.

## II

The voir dire of *United States v. Peters* from which Newspapers, Inc. and Hearst were denied access has long since concluded and the defendants have been convicted in the subsequent trial, the exhibits to which Derus was denied access. The amicus argues therefore that because access is no longer possible, this appeal should be dismissed as moot. We reject the amicus' arguments and hold that neither issue is moot.

■ Moot questions are not justiciable and courts do not rule on such questions to avoid issuing advisory opinions. A case is not moot, however, where even though the factual controversy is over, the case involves an order "capable of repitition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *United*

*States v. Edwards,* 672 F.2d 1289 (7th Cir. 1982).

■ Two conditions must be met to avoid mootness: "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Gannett Co. v. DePasquale,* 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979) (*quoting Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975)). The amicus relies heavily on *In re Greensboro News Co.,* 727 F.2d 1320 (4th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984), to argue that the voir dire in this case was so atypical that it is unlikely to recur. Similarly, the amicus relies on *Flynt v. Weinberger,* 588 F.Supp. 57 (D.D.C.1984), to argue that the events giving rise to the controversy between Derus and Judge Warren are also unique.

■ We disagree that this case was atypical. The voir dire in this case lasted only four days, so that appellants' prompt attempt to obtain relief on the voir dire closure by writ of mandamus was denied by this court on mootness grounds. It is likely that many voir dire proceedings are shorter in duration than the voir dire proceeding at issue in this case, so that orders denying access frequently will "evade appellate review during the period in which contemporaneous access could be granted." *United States v. Edwards,* 672 F.2d 1289 (7th Cir.1982); *see also United States v. Brooklier,* 685 F.2d 1162, 1165 (9th Cir. 1982).

Similarly, there is a reasonable expectation that appellants will face closure orders again. Defendants in this case cited a recent voir dire closure case in the Eastern District of Wisconsin as "precedent for that in this district." Tr. at 4/17/84, 108. The court also referred to a similar case before it years ago noting "[t]hat's never been reviewed, so I don't know if it was right or not and I feel I approach this issue in somewhat the same vein of thought." Unless the district courts are provided with

clear guidelines with regard to closure, denials of access are "capable of repetition." Moreover, the United States Supreme Court's recent mootness decisions suggest that closure orders entered during trials are precisely the kind of rulings which the *Southern Pacific* mootness exception is meant to protect. *See, e.g., Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980); *Gannett Co. v. DePasquale,* 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979); *Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 547, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976).

■ We think the order barring Derus also is capable of repetition. Newspapers, Inc.'s brief informs us that Derus is the *Sentinel's* reporter assigned to cover the Milwaukee federal courthouse. It is not unlikely that in other trials, criminal or civil, or even in a retrial of this case, Derus will be at loggerheads with the courts over access. Moreover, we think it is not unlikely that other reporters, given the nature of their profession, might clash with other judges in contexts as fleeting as was the exhibit access ruling in this case. We think that this case presents a case or controversy within which this court can address the merits of the trial judge's closure order.

### III

■ The public and the press have a constitutional right of access to attend criminal trials. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). While the Constitution nowhere explicitly guarantees the right to attend criminal trials, such a right is implied from the first amendment's "core purpose" of assuring free public discussion. *Richmond,* 448 U.S. at 575, 100 S.Ct. at 2826. While the

right of access is not absolute, any denial of this right must be "necessitated by a compelling governmental interest" and "narrowly tailored to serve that interest." *Globe*, 457 U.S. at 606–07, 102 S.Ct. at 2620–21.

■ The right of access to criminal trials includes a right of access to the voir dire examination of potential jurors in a criminal trial. *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). Following *Globe*, the Court in *Press-Enterprise* declared that "closed proceedings ... must be rare." *Press-Enterprise*, 104 S.Ct. at 824. The Court also delineated the procedure necessary to close voir dire proceedings.

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to serve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enterprise*, 104 S.Ct. at 824. *Accord, Waller v. Georgia*, —— U.S. ——, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).

The *Press-Enterprise* case arose when a California state trial judge closed a portion of the voir dire examination in a capital interracial murder and rape case in which "individual voir dire with regard to death qualifications and ... other ... problem" areas took place. Press-Enterprise Co. was given a hearing on the closure decision but the court denied its motion for access. For all but three days, the six-week voir dire was closed to the press and public. The trial judge also denied Press-Enterprise's requests for transcripts of the voir dire both after the jury was impaneled and after the defendant was convicted and sentenced to death. The judge in that case reasoned that while "most of the information is dull and boring," the transcripts also contained references to jurors' "special experiences in sensitive areas" and that the jurors' right of privacy therefore "should prevail [over] the right of the people to know." *Press-Enterprise*, 104 S.Ct. at 821. The California Court of Appeals denied Press-Enterprise's petition for mandamus and the California Supreme Court denied Press-Enterprise's request for a hearing.

The Supreme Court, following the analysis established in *Richmond* and *Globe* for determining whether the presumption of openness should apply to a government proceeding,[2] found that voir dire proceedings were presumptively open because voir dire proceedings have been historically open, and because openness would provide a functional benefit to the institution of voir dire. The Court found that as early as 1565 jury selection had occurred publicly in England, and that there are accounts of public jury selections in America as early as 1770. *Press-Enterprise*, 104 S.Ct. at 823. The Court found that openness provided a functional benefit to voir dire proceedings in that "public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected." *Press-Enterprise*, 104 S.Ct. at 824. The Court concluded that the presumption of openness applied to voir dire proceedings, and that the state had failed to rebut that presumption.

The Court found that the trial court had asserted the state's interests in the right of the defendant to a fair trial and the right of privacy of the prospective jurors, but that the trial court had made no "findings showing that an open proceeding in fact threatened these interests." *Press-Enterprise*, 104 S.Ct. at 825. Further, the Court

---

**2.** The Supreme Court's analysis in *Richmond & Globe* has been extensively explored, and the ramifications of its holding probed. *See, e.g.,* Fenner & Koley, *Access to Judicial Proceedings: To* Richmond Newspapers *and Beyond,* 16 HARV. C.R.—C.L.L.REV. 415 (1981); Comment, *The First Amendment Right of Access to Civil Trials After* Globe Newspaper Co. v. Superior Court, 51 U. CHI.L.REV. 286 (1984); Comment, *First Amendment Right of Access to Pretrial Proceedings in Criminal Cases,* 32 EMORY L.J. 619 (1983); Comment, *The Public Right of Access to Juvenile Delinquency Hearings,* 81 MICH.L.REV. 1540 (1983).

noted that the trial court had failed to consider whether alternatives were available and that "[a]bsent considerations of alternatives to closure, the trial court could not constitutionally close the voir dire." *Press-Enterprise*, 104 S.Ct. at 825. The Court stated that the trial judge could have warned the jurors as a group that sensitive matters might be discussed in the voir dire, so that they could "request an opportunity to present the problem to the judge in camera but with counsel present and on the record." *Press-Enterprise*, 104 S.Ct. at 825. Finally, the Court remanded the case to the trial judge to release a transcript of the voir dire and to "seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected." The Court observed that the judge should have explained why the entire transcript was entitled to privacy, and should have considered alternatives to nondisclosure of the entire transcript. Therefore, the Court held that the closure order was invalid.

Prior to the Supreme Court's decision in *Press-Enterprise*, two circuits had considered the question of public and press access to voir dire proceedings, and it is helpful to note that both imposed strict closure guidelines, though not precisely those later imposed by the Supreme Court in *Press-Enterprise*. *See generally United States v. Brooklier*, 685 F.2d 1162 (9th Cir.1982); *United States ex rel. Pulitzer Publishing Co.*, 635 F.2d 676 (8th Cir.1980).

The Fourth Circuit is the only federal appellate court to have reviewed the closure of voir dire proceedings in light of the *Press-Enterprise* standard. *See In re Greensboro News Co.*, 727 F.2d 1320 (4th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). The persuasive force of *Greensboro*, which permitted closure of the voir dire, is limited, however, because the Fourth Circuit's initial decision was handed down before *Press-Enterprise*, and its supplemental opinion, denying a petition for rehearing and written after *Press-Enterprise*, affirms the reasoning of the earlier opinion. Moreover, *Greensboro* was a "nearly unique" case, *Greensboro*,

727 F.2d at 1328 n. 4, involving the killing of Communists by Nazis and Klansmen, where the panel of potential jurors numbered 1,500 and more than 750 remained after initial excuses of hardship. *Greensboro*, therefore, sheds little light on the application of the *Press-Enterprise* test to the facts of this case.

■ *Press-Enterprise* requires that the district court must (1) identify an "overriding interest" requiring closure; (2) justify that interest by finding that closure is the only alternative that can serve that interest after specifically considering alternatives to closure; and, (3) "narrowly tailor" the closure order to protect the interest. *Press-Enterprise Co.*, 104 S.Ct. at 824–25; *Waller*, 104 S.Ct. at 2215. We note first that the *Press-Enterprise* holding of a presumption of openness of voir dire proceedings applies equally to state criminal trials, at issue in *Press-Enterprise*, and federal criminal trials, at issue here. The question is therefore whether the presumption of openness was sufficiently rebutted by the district court. Our review of the record in this case convinces us that the district court failed to identify with any specificity an "overriding interest" which required closure to serve that interest's "higher value." At the time that the court granted the closure motion on the second day of voir dire, the only stated reason for the closure was that the court "was a little bit chagrined ... that some of the answers of the individual prospective jurors were in the newspaper." The court did not question the individual jurors prior to the closing of the voir dire to determine whether they had read the *Sentinel* article, in violation of his instructions not to read the newspaper. Nor prior to closing did he ask any of the potential jurors who had read the article whether the article impaired their ability to serve as fair and impartial jurors. Nor did the court call in the press prior to closing the courtroom to have them argue against the closure motion.

It was only after closure had occurred for a day, and in response to appellants'

motion to reconsider the closure order, that the court acknowledged that according to *Press-Enterprise* there is a "presumption that you have got an open hearing." The interest that the court seemed most anxious to protect by closing the court was "the integrity of the process," which the court stated was "being affected because the reservoir is being infected." The court stated specifically that "there is an indication in the questioning that occurred since [the closure] that the jurors saw the article," and that jurors acknowledged an awareness of one of the defendant's "extravagant living style," but made no other findings as to how many jurors were involved, what other "indications" were involved, and why these jurors could not be dismissed from the panel. The court also noted a potential interest in "privacy concerns," but confessed that "that does not deal much with our problem here."

▮▮▮▮ In *Press-Enterprise*, the trial court identified two interests supporting closure, the right of the defendant to a fair trial, and the right of privacy of the respective jurors. The United States Supreme Court in *Press-Enterprise*, however, held these interests insufficient to justify the total closure of voir dire. The principal interest identified in this case, the interest in an impartial jury, arises from the larger interest in the defendants' fair trial right. As the Supreme Court noted in *Press-Enterprise*, "the right of an accused to fundamental fairness in the jury selection process is a compelling interest." *Press-Enterprise*, 104 S.Ct. at 824. But according to *Press-Enterprise*, closure is warranted only if the court makes findings that "open proceedings in fact threatened" the interest at issue. *Id.* Because the district court failed to question potential jurors as to their awareness of media coverage of the voir dire, or engage in any other inquiry to support its conclusion that the "integrity of the process" was infected, we find that the court failed to establish a "threat" to the interest in an impartial jury.

The remaining requirements of the *Press-Enterprise* test are closely inter-

twined with one another. These requirements are designed to insure the greatest protection for an open trial, and limit closure to the least amount possible. In order to protect this right, the record must evidence that the trial judge gave full consideration to these concerns. In this case, however, besides failing to make specific findings regarding the "threat" to an impartial jury posed by media coverage, the court failed to consider fully on the record other alternatives to closure, or to narrowly tailor its closure order.

Sequestration of the entire venire was the only alternative to closure considered by the court. Although the court recognized that "sequestration is an extreme measure," *United States v. Brooklier*, 685 F.2d 1162, 1169 (9th Cir.1982), and carefully detailed why he would not impose sequestration in this case, he did not consider other alternatives or explain their rejection on the record. Nor did defense counsel, who carried the burden of persuasion as the proponents of closure, explain why other alternatives to closure were unavailable. *See Brooklier*, 685 F.2d at 1169. "Absent consideration of alternatives to closure, the trial court could not constitutionally close voir dire." *Press-Enterprise*, 104 S.Ct. at 825.

The trial judge had several alternatives to closure available to him which he did not consider. *See generally Revised Free Press-Fair Trial Guidelines of the Judicial Conference of the United States*, 87 F.R.D. 525, 532 (1980), (discussing more liberal use of traditional techniques for insuring an impartial jury). The judge could have reiterated on a daily basis his instruction to the panel not to read newspapers, listen to radio, or watch television. The judge could have questioned the potential jurors the next day as to whether or not those instructions had been followed and, if they had not, whether contact with the media had rendered the potential juror unable to be impartial. The judge could have dismissed jurors unable to be impartial; if necessary the judge could have dismissed the entire venire and called another until

twelve impartial jurors, unaffected by the media's stories on the trial, were found.

There is, of course, a temptation to assume that the public at large devotes time and effort to reading and remembering news items on pending cases. The real fact is that people who read and write for a living—such as those in the legal or journalism fields—tend to believe that everyone else reads news stories with devoted attention. Considering that a voir dire interrogation of prospective jurors has about the same attention-grabbing excitement as a report on the annual rainfall in northern Tibet, an assumption that anyone read such a story is probably misplaced; at any rate, the admonition given by the court *not* to read such newspaper stories, and a questioning of the jurors after the story has been printed, would seem adequate to prevent any contamination. As to the fears expressed by defense counsel that jurors would not be honest in following the admonition or candid in admitting such a gaffe, the simple answer is that the entire voir dire relies on honest and candid answers to questions of court and counsel. There is no more reason to doubt the integrity of jurors in this regard than in any other area of inquiry.

One of the greatest students of the American jury once remarked that "the jury is a pretty stubborn, healthy institution, not likely to be overwhelmed either by a remark of counsel or a remark in the press." Gillmore, *Free Press v. Fair Trial: A Continuing Dialogue—'Trial by Newspaper' and the Social Sciences*, 41 N.D.L. REV. 156, 167 (1965) (quoting Harry Kalven, co-author with Hans Zeisel of THE AMERICAN JURY (1966)). John Kaplan, writing of his own experience as a trial lawyer, found that "jurors, like most other Americans, mistrust the accuracy of specific statements reported in the press and have a poor memory for these things." Kaplan, *Of Babies and Bathwater*, 29 STAN.L.REV. 621, 623 (1977). Moreover, once impanelled, "jurors almost invariably assumed as a matter important to their status that they knew more about the facts of the case than any newspaper reporter and that their su-

perior understanding was due to their close observation of the trial itself." *Id.* Kaplan concluded that a "minimally competent voir dire" was enough to counter "most media-induced bias." *Id.*

The attitude of juror responsibility was confirmed in a simulated jury study where ninety-seven subjects drawn from a local voter registration list were asked to read various newspaper accounts of a murder and then asked if they believed the defendants were guilty. Thereafter the subjects watched a simulated trial in which the presiding judge admonished them to base their decision on the evidence at trial and not on the speculation of newspapers. Most of the jurors who had concluded that the defendant was guilty before trial changed their minds and found both defendants innocent. The author of the study concluded that the jurors "took the judge's admonition very seriously and were able both to put out of their minds the prejudicial material they had read and to reach a verdict solely on the basis of what they heard at trial." Simon, *Does the Court's Decision In* Nebraska Press Association *Fit the Research Evidence on the Impact on Jurors of News Coverage*, 29 STAN.L.REV. 515 (1977). *See also* Rottenberg, *Do News Reports Bias Juries?*, 15 COL.JOURNALISM REV. 16 (1976). Simon also conducted a telephone survey of members of the community where the defense in a murder trial claimed that media coverage had prejudiced the community, necessitating a change of venue. Of the one hundred and thirty participants, twenty-eight did not remember reading about the crime. One hundred and two participants remembered reading or hearing about the case but of those, only seventy-five could remember details of the crime. Of those seventy-five, twenty said they felt "indifferent" on the issue of guilt and innocence. Simon, 29 STAN.L.REV. 575, 526 (1977). *See also, e.g., United States v. Hendrix*, 752 F.2d 1226, 1231 (7th Cir. 1985) (despite eleven newspaper articles in local papers, most potential jurors could remember no details of what they had heard or read). These studies and conclu-

sions of scholars and practitioners reinforce the Supreme Court's determination that alternatives to closure are effective in guaranteeing an impartial jury even as they protect the great deference due to the press and public's first amendment right of access to voir dire proceedings. We find that the district court failed to follow the *Press-Enterprise* requirements for ordering the closure of the voir dire proceedings at issue in this case and we therefore vacate its order.

### IV

The second order appealed from involves the exclusion of Derus from access to the trial exhibits. The public and press have a longstanding common law right of access to judicial records. *In re Continental Illinois Securities Litigation,* 732 F.2d 1302 (7th Cir.1984). We have recognized that this presumption is of constitutional magnitude through the first amendment. *United States v. Dorfman,* 690 F.2d 1230, 1233–34 (7th Cir.1982). *Accord Associated Press v. District Court,* 705 F.2d 1143, 1145 (9th Cir.1983). The right of access to public documents is "fundamental to a democratic state," *United States v. Edwards,* 672 F.2d 1289, 1294 (7th Cir.1982), and critical to our type of government in which "the citizenry is the final judge of the proper conduct of public business." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

By allowing all members of the press other than Derus access to the trial exhibits the judge implicitly acknowledged the public's and the press' right of access to those exhibits and implicitly concluded that press access did not interfere with the defendants' right to a fair trial. The judge justified his order barring Derus from access to the exhibits as a part of "the inherent power of a Court to discipline somebody who I think does something wrong as a reporter." The judge announced that he thought that Derus' publication of information that she had obtained with the consent of an uninformed law clerk only from unreceived documents left by counsel in a pile

in the courtroom was "a breach of proper etiquette, a breach of ethics, and a breach of trust."

We find that the order of the trial judge barring Derus from access to the trial exhibits was an abuse of discretion. The order was arbitrary, capricious, based on no findings, and issued without a hearing in which Derus could present her case. The judge's remarks indicate that he was relying exclusively on the remarks of his staff in ordering Derus barred. There is no showing in the record of facts indicating any impropriety on Derus' part. Derus apparently saw her opportunity and took it. There was no order in effect barring the press and the public from access to trial documents, admitted or unadmitted. There was no gag order in effect prohibiting the *Milwaukee Sentinel* from publishing any news relating to the trial. There is no showing in the record that the article that was published was improper or irresponsible in any respect as to defendants. It is impossible for this court to review such an order without a hearing on the record and specific findings of fact and conclusions of law.

Moreover, a punitive order barring a single reporter from access to trial exhibits produces a chilling effect on the ability of the press to fulfill its historic role in ensuring the openness and integrity of the judicial process. A trial judge has the discretion to manage his courtroom, and to control access to trial exhibits if that aids in the conduct of an orderly trial. But the arbitrary exclusion of a single reporter from access to exhibits goes beyond efficient courtroom management. Arbitrary exclusion jeopardizes the first amendment's "core purpose" of insuring informed debate of issues crucial to our democratic government. Furthermore, an arbitrary exclusion order constitutes punitive conduct towards the reporter, difficult to justify in any case, and unsupported by the record in this case.

In conclusion, we declare for the reasons stated above, that the district court erroneously closed the voir dire proceedings of a

criminal trial to the press and the public without following the *Press-Enterprise* guidelines, and erroneously barred Reporter Derus from all access to the exhibits admitted into evidence during the same trial. We therefore vacate both the closure and the exclusionary orders.

VACATED.