**UNITED STATES of America, Plaintiff,**

**v.**

**(D–1) Karim KOUBRITI, (D–2) Ahmed Hannan, (D–4) Abdel–Ilah Elmardoudi, a/k/a, Abdella (LNU), a/k/a Nassim Hillali, a/k/a Hussein Mohsen Safiddine, a/k/a Abdelilah el Mardoudi, a/k/a Abdell Ilah Naji, a/k/a Nelson R. Feliciano, a/k/a Nelson Rafael Feliciano Vargas, a/k/a Nelson R. Feliciano**

Vargas, a/k/a Nelson R. Falecian, a/k/a Jean Pierre Tardelli, a/k/a George Labibe, a/k/a Hussein Mohsen Safiddine, a/k/a Nabil Hayamm, (D–5) Farouk Ali–Haimoud, a/k/a Khalid, Defendants.

No. 01–CR–80778.

United States District Court,
E.D. Michigan,
Southern Division.

March 24, 2003.

Richard Convertino and Keith Corbett, Asst. U.S. Attys., Detroit, MI, for plaintiff.

Leroy Soles, Esq., Richard Helfrick, Esq., Detroit, MI, for Def. Koubriti.

James Thomas, Esq., Detroit, MI, for Def. Hannan.

William Swor, Esq., Detroit, MI, for Def. El Mardoudi.

Robert Morgan, Esq., Detroit, MI, for Def. Ali–Haimoud.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO CLOSE JURY VOIR DIRE PROCEEDINGS

ROSEN, District Judge.

### I. INTRODUCTION

Defendants Karim Koubriti, Ahmed Hannan, Abdel–Ilah El Mardoudi and Farouk Ali–Haimoud have moved to close the individual jury *voir dire* in this case.[1] De-

---

1. Defense counsel made an oral motion to close *voir dire* in chambers on March 17, 2003 and formally memorialized the motion in writing on March 18.

fendants maintain that closure of voir dire is necessary to protect their Fifth and Sixth Amendment rights to a fair trial. Non-parties, The Detroit News Inc. (the "News") and The Detroit Free Press, Inc. (the "Free Press"), have filed motions opposing closure. Having reviewed and considered the parties' respective briefs and having heard the oral arguments of counsel, the Court is now prepared to rule on this matter. For the reasons set forth below in this Opinion and Order, Defendants' motion will be granted and the News and Free Press's motions will be denied.

## II. *PERTINENT FACTS*

Karim Koubriti, Ahmed Hannan, Abdel-Ilah El Mardoudi and Farouk Ali–Haimoud are charged with conspiracy to provide material support and resources to terrorists, conspiracy to engage in document fraud, and document fraud. Defendants' arrests came in the immediate aftermath of the September 11, 2001 terrorist attacks on the World Trade Center and the Pentagon. Koubriti, Hannan and Ali–Haimoud were arrested on September 17, 2001, i.e., within a week of the September 11 attacks, when FBI/Joint Terrorism Task Force agents found them while searching for persons who might have knowledge or information concerning the perpetrators of the terrorist attacks. Specifically, the agents were looking for Nabil Al–Marabh, who was listed on the United States terrorist "watch list." The Task Force had learned that Al–Marabh had a residence at 2653 Norman Street in Detroit. Although his name was on the mailbox, Al–Marabh was not at the Norman Street residence; instead, the agents found Defendants Koubriti, Hannan and Ali–Haimoud in the apartment and found them to be in possession of a number of fraudulent passports, visas, social security cards and alien registration cards as well as a day planner containing notations and references to the "American

base in Turkey;" the "American foreign minister;" and "Alia Airport," in Jordan. The day planner also contained sketches of what appeared to be a diagram of an airport flight line, aircraft and runways. False document charges were subsequently filed against these three Defendants.

In the ensuing months, the Government's continued investigation into the events of September 11 and these three original Defendants uncovered other individuals and activities giving rise to the present Third Superseding Indictment charging Defendants Koubriti, Hannan, Ali–Haimoud and Abdel Ilah El–Mardoudi with conspiracy to provide material support or resources to terrorists, conspiracy to engage in document fraud, and document fraud.

Over the past eighteen months, this case has drawn a great deal of media attention, both locally and nationally. Furthermore, particularly in the aftermath of the events of September 11, public sentiment and emotions concerning "terrorism" remain highly charged. Given that this case is the first post-September 11 case to go to trial which raises issues bearing on international terrorism, the Court determined that to ensure the privacy rights of potential jurors and protect them from undue harassment by the media and other curiosity-seekers, it would be in the best interest of the jurors and the parties that the jury in this case remain anonymous.

*The Jury Selection Procedure in this Case*

The heightened emotions and public sentiment that allegations of terrorism engender in the aftermath of 9/11 and media attention generated by this case also raised the concerns of the parties and the Court about ensuring that the parties be able to adequately explore prospective juror bias. Therefore, with input from counsel for the Defendants and the Government, the Court prepared a detailed

questionnaire with 103 questions for the venirepersons to complete. The Defendants and the Government provided the Court with specific questions for inclusion in the questionnaire, and the Court also included in the questionnaire its own questions. The questionnaires asked for personal background information, knowledge of the case, the parties, counsel, and persons likely to be mentioned during trial, the extent of their awareness of publicity about the case and the Defendants, and their attitudes toward Islam, persons of Arabic or Middle Eastern descent, law enforcement and the Government.

The venirepersons were summoned to appear to complete the questionnaires three weeks before trial. The Court addressed the assembled venire before they commenced the questionnaires.

In its remarks to the venirepersons, the Court gave a brief description of the case and the charges against the Defendants. The Court then explained that the 103–question questionnaire was designed to expedite the jury selection process, emphasizing that it was important that the Defendants and the Government have sufficient information about each prospective juror's background, experiences and views so that they could be assured that a fair and impartial jury would hear this case. Therefore, the Court admonished the prospective jurors to be completely frank and candid in responding to the questionnaire. To ensure the prospective jurors' honesty and candor, the jurors were assured that their answers would not become public; they would only be provided to the Court and counsel for the parties.[2] Once the prospective jurors completed the questionnaire, they were sent home with the instruction that they were not to discuss the questions or their answers with anyone. They were further instructed not to read,

watch or listen to media reports concerning the case or any of the Defendants. They were then instructed to return for follow-up individual *voir dire* on March 18, 2003.

Copies of the questionnaire provided to the jurors and a transcript of the Court's instructions were provided to the media in full unredacted and unedited form.

Copies of the jurors' completed questionnaires were then prepared and provided to the Court, and to each of the Defendants' attorneys and to the Government. The Court subsequently met with all counsel the week before March 18 and reviewed, on the record, the jurors' answers to the questionnaires. As a result of this review, the parties stipulated to excusing a few jurors for hardship and health reasons. However, with respect to the remainder of the questionnaires, the Court and the parties determined that further inquiry was required on the jurors' responses to specific questions. So as to avoid the possibility of contaminating the venire with the views of individual jurors, all parties were in agreement that the prospective jurors would be questioned separately and individually, out of the presence of the other jurors.

The Defendants now request that the Court close the individual jury *voir dire* to the public and the media to ensure their constitutional right to an fair trial. Defendants argue that if the media is present during *voir dire* questioning it is likely that the jurors' responses would lack the candor necessary to ensure a fair trial and that, despite the Court's instructions to the contrary, some of the over 200 remaining prospective jurors would, in the intervening period of individual *voir dire*, read or hear media accounts of juror responses

---

2. To maintain the jurors' privacy, the venirepersons answered the questionnaires anonymously, using only their juror numbers instead of their names.

and the jury pool would become tainted, thereby defeating the purpose of individual *voir dire*. The News and the Free Press argue that because the Court has already ordered that the jury remain anonymous, closure of *voir dire* is unnecessary. Therefore, the media requests that the Court conduct *voir dire* in an open proceeding and allow reporters access to these proceedings.

## III. *DISCUSSION*

■ The motions of the Defendants and the media present a clash of competing important constitutional interests, both of the parties and the public. On the one hand, under the Fifth and Sixth Amendments of the Constitution, the Defendants are guaranteed a right to a fair trial and impartial jury. On the other hand, the media has an important First Amendment right of open access to judicial proceedings. The Court's task in this case, therefore, is to balance and reconcile these competing interests and, at the same time, attempt to ensure that the parties are afforded the constitutional protections to which they are entitled.

The seminal case addressing the propriety of closed jury *voir dire* proceedings is *Press–Enterprise Company v. Superior Court of California*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I*"). Albert Brown, the defendant in *Press–Enterprise I*, was charged with the rape and murder of a teenage girl. Before the *voir dire* examination of prospective jurors began, Press–Enterprise moved that *voir dire* be open to the public and the press. The prosecutor opposed the motion. The court agreed with the prosecution and ordered that individual *voir dire* of jurors be closed to the public and the press. The *voir dire* consumed six weeks.

After the jury was empaneled, Press–Enterprise moved the trial court to release a complete transcript of the *voir dire* proceedings. The trial judge denied Press–Enterprise's motion stating that he believed that release of the transcript would violate the jurors' right of privacy and negatively affect the defendant's right to a fair trial. The case proceeded to trial and the jury returned a guilty verdict. After Brown was convicted and sentenced, Press–Enterprise again moved for release of the transcript of jury *voir dire*. The trial court again denied the motion. The case was ultimately appealed to the Supreme Court.

The Supreme Court vacated the trial court's orders and, in so doing, set forth the standards under which jury *voir dire* may be closed to the public and the press:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

464 U.S. at 510, 104 S.Ct. at 824.

The Court then proceeded to examine whether the presumption of openness had been rebutted and found that it had not. The Court gave three reasons for rejecting the limitation on access to *voir dire*. First, the trial judge had made no findings to support the asserted interests of assuring a fair trial and protecting the privacy of jurors. *Id.* at 510–11, 513, 104 S.Ct. at 824, 825–26. Second, the trial judge had not considered alternatives to the limitation imposed. *Id.* at 513, 104 S.Ct. at 825–26. Third, the *voir dire* transcripts were permanently sealed. *Id.*

In its ruling, the Supreme Court gave particular attention to steps that a trial judge should take to protect the jurors' interest in maintaining the privacy of high-

ly personal or embarrassing matters that might be elicited during *voir dire* questioning. *See id.* at 511–12, 104 S.Ct. at 824–25. When the interest is asserted, the trial judge should inform jurors of their opportunity to request presentation of their concerns *in camera,* at which time the judge may determine either to excuse the juror, or to seal the *in camera* responses for "a reasonable time," or to withhold either a part of the transcript or the name of the juror. *Id.* at 512, 104 S.Ct. at 825.

While the Court in *Press–Enterprise I* outlined procedures for a trial court to follow when confronted with one problem—protecting the jurors' interest in maintaining the privacy of highly personal or embarrassing matters that might be elicited during *voir dire* questioning—the *Press–Enterprise I* Court had no occasion to discuss the very serious, and very different, concerns raised by Defendants in this case, i.e., how to protect the accused' rights to a fair trial by avoiding inhibitions upon jurors' candor, and in a *voir dire* over an extended period of time with a very large venire pool, prevent the contamination of that pool, in order to assure that a fair and impartial jury will be selected. Although the *Press–Enterprise I* Court recited in its statement of facts that the prosecutor argued that "if press were present, juror responses would lack the candor necessary to assure a fair trial," 464 U.S. at 503, 104 S.Ct. at 820, its discussion of the legal standards and the competing interests to be considered is devoid of any mention of the threat to juror candor. The limitation on access to *voir dire* questioning was rejected not because the Court found the accused's Sixth Amendment interest in a fair trial to be insubstantial but because of the trial judge's failure to make findings, failure to consider alternatives,

and failure to adopt a narrowly tailored limitation.

The News and the Free Press similarly do not focus on the Fifth and Sixth Amendment interests raised by Defendants in an impartial jury and a fair trial, but rather have framed the arguments in their briefs around the jurors' privacy interests and how those interests are already protected by virtue of the Court's anonymous jury order.

Although the *Press–Enterprise I* Court did not address closure of *voir dire* in the context of protecting the accused's fair trial rights, other courts have squarely faced this issue.

In *United States v. King,* 140 F.3d 76 (2nd Cir.1998), the Second Circuit affirmed the district court's closure of *voir dire* finding that limiting access to *voir dire* was justified by the need to avoid impairing candor of prospective jurors. Unlike *Press–Enterprise I,* as in the instant case, it was the defendant, not the government, who moved to close *voir dire.* (The government, in fact, joined the newspaper-intervenors in opposing closure.)

The case involved the re-trial of boxing promoter Don King on charges of wire fraud.[3] The case attracted a great deal of publicity in New York. In closing the proceedings to the press, the district court made several findings. First, the district court noted that King is "an extremely controversial person" and that he has been "the subject of a very substantial amount of publicity, a large proportion of which is negative." 140 F.3d at 79. The court cited as examples several inflammatory headlines in *The New York Post* and the *Daily News,* and an HBO movie about King that portrayed him in a very negative way which was airing repeatedly at the

---

**3.** The jury deadlocked in King's first trial. *Voir dire* was also closed in the first trial and the transcripts of those proceedings were sealed without press objection.

time of jury *voir dire.* *Id.* at 80. The court then found, based on its experience from the first trial jury *voir dire,* that "a number of prospective jurors for the forthcoming trial will have strong views about King." *Id.*

The court expressed its concern that juror candor was likely to be restricted if *voir dire* were conducted in open proceedings. Specifically, the trial court stated that "full and frank answers are of particular importance in the present case because of the widespread publicity" concerning King, and that "[k]nowledge on the part of prospective jurors that their answers on *voir dire* will be reported in the press may so inhibit or chill truthful responses that [the] accused is denied the fair trial to which he is entitled." *Id.*

Finally, the trial court noted that the usual instruction to members of the venire not to read press reports of the trial, including jury selection, could not be relied on to avoid inhibiting candor because the jurors might be told of press accounts of their responses by others, before they could prevent such communication, and because the jurors would fear the adverse reaction of others who might disapprove of the jurors' candid views. *Id.* Therefore, the court concluded that without some limited closure there existed "persuasive evidence of serious risk (a) to an important interest... *i.e.,* [a] substantial risk of seriously lessening juror candor in *voir dire*... and (b) to the impartiality of the jury." *Id.* (citations omitted.).

Therefore, the district court implemented the following *voir dire* procedure. First, prospective jurors filled out extensive questionnaires about personal background information, knowledge of the parties, counsel, and persons likely to be mentioned at trial, the extent of their awareness of publicity about the case and the defendants, and attitudes toward King and the Government. Access to the completed questionnaires was limited to the court and the parties until the jury was empaneled. *Id.*

Individual follow-up questioning of prospective jurors was conducted out of the presence of the public and the press. *Id.* During individual *voir dire,* each juror was asked whether his or her responses might warrant protection from dissemination to the press because they touched on deeply personal matters. *Id.* If the court were persuaded that such additional protection was warranted, that juror's response was redacted. *Id.* Once the jury was empaneled, the court released the redacted transcript to the press. *Id.*

The Second Circuit approved the district court's procedures. The appellate court noted that the district court's ruling in *King* "suffers from none of the defects that warranted reversal in *Press–Enterprise I,*" *id.* at 82, explaining:

> [The district court] made explicit findings to support the limitations he imposed. He selected these limitations only after considering various alternatives, rejecting both more extensive steps suggested by the defendants as too burdensome upon a right of public access and less extensive steps suggested by the press as inadequate to protect the defendants' right to a fair trial.... Finally, he imposed his limitations only for the brief duration of time necessary to impanel a jury, except for any particular jury responses that warranted additional sealing, as contemplated by *Press–Enterprise I.*

140 F.3d at 82.

The appellate court also rejected the newspapers' argument—which is the same argument the News and the Free Press make here—that the district court was required by *Press–Enterprise I* to ascertain from each juror in open court whether that juror wished to be heard *in camera* to

assert privacy concerns as to sensitive matters. The court explained:

Judge McKenna was concerned not merely with protecting the privacy of the jurors from public disclosure of sensitive, personal matters but also with assuring their candor in responding to questions so that a fair trial would be assured. In light of the widespread and largely negative publicity concerning King and the racial tensions heightened by some aspects of that publicity, he was entitled to conduct individual juror questioning in the absence of the press. It is one thing to oblige jurors to state in public that they prefer a closed door session to identify sensitive matter elicited by a questionnaire. It is quite a different matter to expect them to acknowledge in public that their own candor will be inhibited by questioning in public.

*Id.*

The Fourth Circuit also approved the district court's closure orders in *In re South Carolina Press Association,* 946 F.2d 1037 (4th Cir.1991). The media's challenge in that case was the district court's closure of *voir dire* proceedings in three trials involving extortion charges against members of the South Carolina General Assembly. As in this case and *King,* the defendants wanted *voir dire* closed to protect their right to a fair trial. The Fourth Circuit found that the defendants' right to a fair trial was paramount and upheld the district court's closure order explaining:

The right of the press to access to criminal proceedings is presumed, but it is qualified because it must yield to a defendant's Sixth Amendment right to a fair trial when there is a finding that the right of the accused to a fair trial will be undermined by the publicity resulting from press coverage....

The selection of a fair and impartial jury is a right protected by the Sixth Amendment and is one of the "high values" mentioned above. Full and frank answers from potential jurors, when they are questioned in *voir dire* are essential to the process of selecting such a jury. Pretrial publicity can prevent an accused from receiving a fair trial. Furthermore, fear of publicity that might be given to answers of venirepersons during *voir dire* may so inhibit or chill truthful responses that an accused is denied the fair trial to which he is entitled under the Fourteenth Amendment.

\*   \*   \*   \*   \*   \*

Closure of voir dire is an effective means by which to protect the defendants against the perceived threat to a fair trial in these cases. As we found in *In re Greensboro News Co.,* [727 F.2d 1320 (4th Cir.1984),]

Finally, there is no argument that the closure order will fail to protect against perceived harms. The elimination of publicity concerning the individual *voir dire* will assure that potential jurors will be insulated from the questions and other jurors' answers for as long as possible. Furthermore, the potential jurors will be more candid in their responses if they do not have to worry about what the public's opinion of those responses might be.

727 F.2d at 1326.

We agree with the district court that under the very unusual circumstances of these cases, no reasonable alternatives to closure will adequately protect the fair trial rights of the accused.

946 F.2d at 1044.

It is significant to note that, in *South Carolina Press Association,* the media had argued—just as the News and Free Press argue here—that assigning numbers to ju-

rors so that they could be questioned anonymously would provide a less restrictive means for insuring juror candor than closing the proceedings. The *South Carolina Press Association* court found that anonymity of jurors would be insufficient to insure complete candor because "even if the juror is assigned a number, they are aware of the presence of the press in the courtroom." *Id.* at 1041. With the press present in the courtroom, jurors would not only be less likely to be candid when questioned about their biases and prejudices, but also they would be less likely to admit that they had not adhered to the Court's instructions to not read or listen to media reports and, having disregarded those instructions, had, in fact, read newspaper articles or listened or watched news broadcasts about the case.

The News and the Free Press point to *Cable News Network, Inc. v. United States*, 824 F.2d 1046 (D.C.Cir.1987), *cert. denied*, 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987); *In re Memphis Publishing Co.*, 887 F.2d 646 (6th Cir.1989), and *United States v. Peters*, 754 F.2d 753 (7th Cir.1985), maintaining that these cases stand for the proposition that closing *voir dire* is impermissible. The News and the Free Press misconstrue the holdings in these cases. In *Cable News Network*, limitation of access to *voir dire* purportedly entered solely to protect jurors' privacy interest, was set aside for lack of findings, lack of consideration of alternatives and failure to follow the procedure outlined in *Press–Enterprise I* for responding to juror concerns about privacy. Similarly, in *In re Memphis Publishing* and *United States v. Peters*, the Sixth and Seventh Circuits, respectively, found that the district courts failed to make sufficient findings to justify the closure orders. *See In re Memphis Publishing*, 887 F.2d at 648–49 ("[T]he naked assertion by the district court in this case that defendant's Sixth Amendment right to a fair trial 'might well be undermined,' without any specific finding of fact to support that conclusion was insufficient to justify closure under *Press–Enterprise I* and *Press–Enterprise II* [478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ].") *See also, United States v. Peters*, 754 F.2d at 760 (presumption of openness was not sufficiently rebutted by district court, where the court failed to identify with any specificity any "overriding interest" which required closure to serve that interest's "higher value.") None of these cases suggests, however, that closure orders are *per se* invalid. Rather, as the above-decisions demonstrate, the application of the standards of *Press–Enterprise I* depends on the precise circumstances confronting the trial judge and the extent to which the judge makes supportable findings, considers alternatives, and frames a limited form of relief.

Read together and distilled into a workable legal standard, these cases require the Court to strike a balance between the competing constitutional interests of the media and the Defendants. The Court starts with the premise that the media, in its role as the public's watchdog, has an important First Amendment right of open access to judicial proceedings, a right which, in fact, establishes a presumption of openness of such proceedings, and nothing in the Court's opinion today is intended to denigrate or diminish either this First Amendment right or this presumption of openness. However, this presumption is not irrebuttable or conclusive; rather, it is to be weighed against other important—and sometimes competing—constitutional rights, such as the Fifth and Sixth Amendment fair trial rights Defendants have presented here. The Court, therefore, must attempt to strike a balance between these interests to insure no broader an incursion into free press and free speech rights than necessary to protect the Defendants' competing Fifth and Sixth Amendment rights.

As indicated above, this is the first post-September 11 case involving allegations of international terrorism to go to trial. Not surprisingly, the case has been the subject of extensive media coverage. In reviewing the jurors' responses to the questionnaires (and in the actual *voir dire* itself of more than 40 individual jurors since the Court verbally granted Defendants' motion and began *voir dire* ), the Court has found that a sizeable number of prospective jurors have strong views about the Middle East, persons of Middle Eastern descent, the Government and terrorism. *Voir dire* has, and will continue to, explore these issues in great detail with prospective jurors and, thereby, ensure the Defendants' right to an impartial jury. The jurors' complete candor is absolutely essential to flesh out their views and biases. Furthermore, a number of prospective jurors expressed concern about having to publicly state their views and, unfortunately, have or heard media reports about the case since completing the questionnaire.[4]

Moreover, as noted, although the jury pool was instructed not to read press reports about the case, prospective jurors have written the jury clerk informing her that they have read the papers, and in the *voir dire* to date, have similarly indicated that they have either read or heard about the case in the media. With such a large pool of venirepersons (approximately 222 people) and with jury selection likely to take more than a week to complete, if the media were to report on the *voir dire* proceedings daily, the likelihood that prospective jurors might be tainted by the *voir dire* answers given by previous jurors is seriously increased. And, given the size of the venire panel, there is little the Court can realistically and reasonably do to insure that prospective jurors do not read or listen to media accounts during the period of continuing *voir dire*. The right of the Defendants to a fair trial would, thus, be undermined by the publicity resulting from press coverage of *voir dire* while, at the same time, providing little of great news value to the public.[5] Indeed, the Court agrees with Defendants that, to a great extent, the entire objective of pursuing candor and eliminating the potential for taint through individual *voir dire* would be greatly compromised by permitting daily media coverage of juror testimony.

The Court must also reject the argument posited by the News that closing *voir dire* is unnecessary in light of the Court's anonymous jury order. If the Court's reason for closing *voir dire* were solely to protect the privacy rights of prospective jurors, the News's argument might arguably have greater force. However, the interest of concern here is the Defendants' Fifth and Sixth Amendment right to an impartial jury and a fair trial. As the Fourth Circuit found in *In re South Carolina Press Association*, the right of the press to access to criminal proceedings must yield to the "higher value" of a defen-

---

4. A number of the prospective jurors have written to the Court since filling out the questionnaires expressing these concerns. By way of example, one juror wrote after unavoidably seeing a front-page article in the Free Press about the jury questionnaire and the Court's remarks to prospective jurors that, although he felt secure and confident about being fair and open-minded and being part of the jury in this case after leaving the courthouse on February 21st, after seeing the article in the newspaper he was not so sure and he felt like the newspaper had "put a bulls eye on [his] back." Several prospective jurors already interviewed have expressed similar sentiments albeit not as graphically.

5. In this context, the Seventh Circuit has suggested that "a voir dire interrogation of prospective jurors has about the same attention-grabbing excitement as a report on the annual rainfall in northern Tibet." *United States v. Peters, supra,* 754 F.2d at 762.

dant's Sixth Amendment right to a fair trial. 946 F.2d at 1043.

The Court also rejects as impracticable and, ultimately, ineffective, the alternative suggested by the News of only a limited closure of the voir dire proceedings by "side bar" questioning of jurors who request such private questioning on particularly sensitive issues. This alternative might be adequate if the concern was solely to protect the privacy rights of the jurors, but as emphasized above, the concern here is the Defendants' right to an impartial jury and a fair trial. This suggested alternative does not address this issue. The juror would have to request the side bar after the question has already been posed—which only attracts more attention to the matter—and, having a gallery full of press would chill the juror's response.

Further, given the nature of the particular voir dire in this case—which primarily probes into those areas of the jurors' responses to the questionnaire which raise sensitive issues—there would be relatively little questioning which would not raise at least the possibility of juror sensitivity and taint if the responses were made public. To be required, on a continuous and ad hoc basis to either serially close the voir dire or do it at side bar with each juror, and potentially each series of questions, would invariably prolong greatly and truncate the jury selection process, which would lead to juror frustration.[6]

The alternatives noted in United States v. Peters, 754 F.2d 753 (7th Cir.1985), which the Free Press suggests, are similarly unworkable here. The Seventh Circuit suggested as alternatives to closure in that case that the court reiterate on a daily basis to the venire pool not to read newspapers, listen to the radio, or watch television, and question them the next day as to whether or not those instructions had been followed. Because of the large number of venirepersons in this case, not all of the 222 jurors are coming to the court every day. While the entire pool was told to report on March 18, 2003, because of the size of the pool, only approximately 30 jurors per day are reporting (after the first day) to be individually voir dired. Therefore, the Court is unable to instruct and question the entire jury pool each day as to whether they are reading or listening to media reports about the case. Sequestration of the 222–person venire is likewise, of course, is an impracticable option.

■ The right to a trial before a fair and impartial tribunal "is a basic requirement of due process," In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), and must be safeguarded with vigilance. It is, in the words of the United States Supreme Court, "the most priceless right" guaranteed by the Constitution. See Irvin v. Dowd, 366 U.S. 717, 721, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Given the substantial potential for juror taint and chilling juror responses presented in this case, in order to ensure the Defendants a trial before a fair and impartial tribunal, the Court finds that individual juror voir dire must be closed to the public and the media.

However, the Court will open jury selection proceedings once all "for cause" challenges have been resolved and the process reaches the peremptory phase. Further, the Court will also release a transcript of the closed voir dire once the jury is empaneled. Finally, the Court will also make available to the media basic demographic information about the empaneled jury. Although these measures may not fully

---

6. The Court has already received a number of letters from prospective jurors about the length—at this writing only four days—of the voir dire process.

satisfy all of the First Amendment issues the media represents, they do go a long way toward reducing the overall infringement on those rights.

At oral argument, in response to this proposal from the Court, counsel for the News and the Free Press argued that a blanket closure order is constitutionally infirm and that that infirmity is not adequately cured by providing a transcript at some later date because some information, such as the juror's demeanor, non-verbal responses, emotional reactions, and the like, is lost in the transcription of a live proceeding into a cold transcript. In support of this contention, the News relies upon a footnote in *United States v. Antar*, 38 F.3d 1348 n. 13 (3rd Cir.1994). Reliance on *Antar* is misplaced. In that case, the Third Circuit held that the district court had erred in closing a criminal proceeding *and* sealing the transcript without making particularized findings. It was the lack of particularized findings that led the *Antar* court to conclude that releasing a transcript of the proceedings was insufficient to cure the failure to make particularized findings.

The newspapers' reliance on *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir.2002), is similarly misplaced. That case did not involve jury *voir dire*; it involved closed administrative INS deportation proceedings. There was no threat of jury taint or chilling of candid responses. Furthermore, it was the intended deportee, Rabih Haddad, who, along with the Free Press, moved to keep the proceedings open to the public and the press, whereas here, of course, it is the Defendants themselves who are asserting their constitutional rights in moving to close the proceedings. More importantly, with re-spect to the question of a transcript, the court there did not hold that a transcript is a constitutionally insufficient substitute for access to a closed proceeding as a matter of law. The court only addressed the sufficiency of the transcript as an "other factor" to be considered in determining whether to grant preliminary injunctive relief, and in the context of insufficient subsequent measures to ameliorate the alleged irreparable harm that the newspaper would suffer if the request for preliminary injunctive relief were not granted, the court noted that there "is no assurance that [a transcript] will completely detail the proceedings." [7]

Boiled down to its essence, what the News and the Free Press really complain of is that they will lose the contemporaneity and the "color and texture" of the *voir dire* proceedings if they have to rely on a transcript of the proceedings. As the court found in *In re Greensboro News Company*, 727 F.2d 1320 (4th Cir.1984), *cert. denied*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984), when faced with an identical argument,

> The purely commercial side, the greater value of "hot" news as compared to news delayed, but fully disclosed and equally accessible to all when released, does not, in our judgment, amount to a substantial constitutional consideration, at least when measured against the not inconsiderable Sixth Amendment concerns of the defendants.

> \*　　\*　　\*　　\*　　\*　　\*

On balance, we are satisfied that the substantive contents of the statements made at *voir dire* will be in all essential respects as newsworthy if disseminated to the public on Monday, January 23,

---

7. In this context, the Court notes that reliance on transcripts to reflect proceedings is hardly a novel concept. Indeed, if transcripts insufficiently detailed court proceedings, then ap-pellate courts and other reviewing bodies could never have sufficient information to do their jobs.

1984 as on Monday, January 16, 1984. The likelihood of candor and consequent enhanced truth will be increased. The threat of theoretical diminution in the impact of a delayed description of the performance of actors, in a fleeting scene in the court drama preliminary to the main stage setting, fades in importance when contrasted with the highly likely slackening in the assurance of the best possible jury if unrestricted access by the petitioners to the *voir dire* before it is completed and the jury and alternates seated is permitted. *Voir dire*, as contrasted to the trial, is of limited scope, finite and brief. It must be kept in the forefront of our minds that two weeks of delay, but none whatsoever in denial of full access, are what are involved.

*Id.* at 1323–24, text plus n. 7.

■■■■ The Court here is fully cognizant of the important First Amendment principles inherent in the presumption that court proceedings be open to the public and the press. However, as noted, that right of the press is not absolute. The presumption of openness may be overcome by overriding constitutional values based on findings that closure is essential to preserve those higher values. *Press–Enterprise I, supra,* 464 U.S. at 510, 104 S.Ct. at 824. And, as the *Press–Enterprise I* Court itself observed, "No right ranks higher than the right of the accused to a fair trial." *Id.* at 508, 104 S.Ct. at 823. As discussed above, eliminating contemporaneous publicity concerning individual *voir dire* in this case will preserve Defendants' fair trial rights by insuring the candor of the potential jurors' answers to *voir dire* questioning and assuring that the potential jurors will be insulated from other jurors' answers as thoroughly and completely and for as long as possible, thereby minimizing the potential for juror taint.

When the Defendants' right to an impartial jury and a fair trial is weighed against the interests of the News and Free Press, the Court finds that, in this case, because of the potential for juror taint, the need for complete candor from the jurors, and the danger of chilling that candor, the interest of the media must give way to the fair trial rights of the Defendants. This is particularly true in a case of this nature involving such serious charges and the highly-charged climate in which the case is being tried. Further, as noted, because the proceedings will be re-opened once all "for cause" challenges are resolved and because the press will be given a transcript of the closed *voir dire* proceedings once the jury is empaneled and demographic information concerning the empaneled jurors, the infringement upon the News's and the Free Press's First Amendment rights are diminished, and, thereby, the Defendants' fair trial rights predominate.

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that the Motion of the Defendants to close individual juror *voir dire* is granted and the Motions of the News and Free Press are denied. The Court will re-open jury selection proceedings once all "for cause" challenges have been resolved and the process reaches the peremptory phase and will release a transcript of the closed *voir dire* once the jury is empaneled. The Court will also provide the media with information concerning the empaneled jury.

SO ORDERED.